IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:22-cv-680

| | |
|---|---|
| DAMIAN MCDONALD, on behalf of the Laboratory Corporation of America Holdings Employees' Retirement Plan, himself, and all others similarly situated, <br><br>      Plaintiff, <br><br>      v. <br><br> LABORATORY CORPORATION OF AMERICA HOLDINGS, <br><br>      Defendant. | **CLASS ACTION COMPLAINT** |

On behalf of the Laboratory Corporation of America Holdings Employees' Retirement Plan ("Plan"), the Named Plaintiff, Damian McDonald ("Plaintiff"), files this Class Action Complaint against Laboratory Corporation of America Holdings ("Labcorp" or "Defendant"), for breaching its fiduciary duties in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

## BRIEF OVERVIEW

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1109 and 1132, against Defendant, the Plan's fiduciaries, for breaches of fiduciary duties.

2.      Defined contribution retirement plans, like the Plan, confer tax benefits

on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held $7.9 trillion in all employer-based defined contribution retirement plans as of March 31, 2020, of which $5.6 trillion was held in 401(k) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020).

3.     In a defined contribution plan, "'participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Because all risks related to high fees and poorly performing investments are borne by the participants, the employer has little incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent.

4.     The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

5.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries

- 2 -

must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

6. Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers excessive fees can dramatically reduce the amount of the benefits available when the participant is ready to retire. Over time, even small differences in fees can compound and result in a vast difference in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

7. The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, p. 2 (September, 2019).

8. The Plaintiff is a Plan participant. As of December 31, 2020, the Plan had approximately $3.9 billion in assets and 55,355 total participants with account balances as of the end of the plan year, qualifying it as a "mega plan" in the defined contribution 401(k) marketplace. Instead of leveraging the Plan's tremendous

bargaining power to benefit participants and beneficiaries, Defendant caused the Plan to pay unreasonable and excessive fees for recordkeeping and other administrative services.

9.     Plaintiff has standing to bring this action on behalf of the Plan because Plaintiff participated in the Plan and was injured by Defendant's unlawful conduct. Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently, or as of the time his account was distributed (no such distribution has occurred), and what his accounts are or would have been worth, but for Defendant's breaches of fiduciary duty as described herein.

10.     For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon several factors.

11.     For example, Defendant did not adhere to fiduciary best practices to control Plan fees and expenses. To the extent that Defendant made any prudent attempt to control the Plan's expenses and to ensure the expenses were not excessive, Defendant employed flawed and ineffective processes, which failed to ensure that: (a) the fees and expenses charged to Plan participants were reasonable, and (b) that the compensation third-party service providers received from the plan for services provided were reasonable.

12.     Defendant's mismanagement of the Plan constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Defendant's actions

(and omissions) were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

**JURISDICTION AND VENUE**

13.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

14.     This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, and where at least one of the alleged breaches took place. Additionally, venue is proper in this Division because Defendant is headquartered in Burlington, North Carolina.

**THE PLAN**

15.     The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

16.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

17.     More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

18.     Eligible current and former employees of Labcorp are eligible to participate in the Plan. The Plan provides the primary source of retirement income

- 5 -

for many former Labcorp employees.

## THE PARTIES

### *Plaintiff & Standing*

19.     Named Plaintiff Damian McDonald is a participant in the Plan under 29 U.S.C. §1002(7) because he is eligible to receive benefits under the Plan.  In fact, he is currently employed by Labcorp and participating in the Plan.

20.     In terms of standing, §1132(a)(2) allows recovery for a "plan" and does not provide a remedy for individual injuries distinct from plan injuries. Here, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches.

21.     The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254.

22.     Section 1132(a)(2) authorizes any participant to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches and it remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff.

23.     To the extent the Plaintiff must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, Plaintiff has

standing to bring this action on behalf of the Plan because he participated in the Plan and was injured and continues to be injured by Defendant's unlawful conduct.

24.     To establish standing, the Plaintiff need only show a constitutionally adequate injury flowing from those decisions or failures. The Plaintiff alleges such an injury for each claim.

25.     More specifically, the Plaintiff has standing because the challenged conduct, including Defendant's actions resulting in Plaintiff and the class members paying excessive recordkeeping and administrative fees, affected all Plan participants in the same way.

26.     For example, the Named Plaintiff's individual account in the Plan suffered losses because, in fact, each participant's account was assessed an excessive amount for recordkeeping and administrative fees, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan and reduced those fees to a reasonable level.

27.     All class members have standing for the same reason.  Each class member's individual account in the Plan suffered losses because, in fact, each participant's account was assessed an excessive amount for recordkeeping and administrative fees, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan and reduced those fees to a reasonable level.

28.     As a result of Defendant's actions, the Plaintiff and class members are

entitled to restitution in the amount of the difference between the value of their account currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendant's breaches of fiduciary duty as described herein.

### *Defendant*

29.     Defendant is the Plan Sponsor and a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) it is a named fiduciary under the Plan, (b) during the Class Period, it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

30.     Defendant is also a fiduciary to the Plan because it is the Plan Administrator and exercised authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of Plan assets and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

### *Additional Information on the Plan*

31.     All persons employed by Labcorp and its participating affiliates are eligible to participate in the Plan except those with collective bargaining rights. Labcorp employees may enroll in the Plan on the first day of any pay period.

32.     Fidelity    Investments    Institutional    Operations    Company,    Inc.

("Fidelity") is the Plan's recordkeeper and has been for at least the last six years.

33.    Defendant has overall responsibility for the operation and administration of the Plan.

34.    Each year, participants may elect to contribute from 1% to 50% of their base pay on a pretax and/or after-tax basis up to an amount that will not violate provisions of the Plan or exceed the maximum contribution allowable under the IRC.

35.    Vesting Participants are immediately vested in their contributions plus actual earnings thereon. Since January 1, 2010, participants were immediately vested in the Company's safe harbor nonelective 3% contributions and discretionary nonelective contributions plus actual earnings thereon.

36.    On July 7, 2020, the Compensation Committee of the Board of Directors approved the merger of the Covance 401(k) Savings Plan and the Laboratory Corporation of America Holdings Employees' Retirement Savings Plan. During 2020, account balances totaling $1,567,875 were transferred from the Covance 401(k) Savings Plan to the Plan.

37.    The Plan also permits Roth contributions and conversion of pretax contributions to Roth contributions. Participants who are age 50 or older are eligible to make catch-up contributions. Rollover contributions from other qualified plans are allowed.

38.    Each Plan participant's account is credited with the participant's

contribution and allocations of (a) the Company's contributions, if any, and (b) Plan earnings, and charged with an allocation of administrative expenses. Allocations are based on participant earnings or account balances, as defined. The benefit to which a participant is entitled is the benefit that can be provided from the participant's vested account.

## CLASS ACTION ALLEGATIONS

39. Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 in a representative capacity on behalf of the Plan and seeks certification of the following proposed class ("Class"):[1]

> All persons, except Defendant and its immediate family members, who were participants in or beneficiaries of the Plan, at any time between August 17, 2016, and the present (the "Class Period").

40. The members of the Class are so numerous that joinder of all members is impractical. According to the most recent Form 5500 filed with the U.S. Department of Labor, there were 55,355 Plan participants with account balances, as of December 31, 2020.

41. Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and suffered injuries because of Defendant's mismanagement of the Plan. Defendant treated Plaintiff

---

[1] Plaintiff reserves the right to propose other or additional classes or subclasses in her motion for class certification or subsequent pleadings in this action.

consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendant as alleged herein, and all members of the Class have been similarly affected by Defendant's wrongful conduct.

42.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Defendant is a fiduciary of the Plan;

B.     Whether Defendant breached its fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether Defendant failed to adequately monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of relief.

43.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

44.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A)

because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

45. In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendant has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANT'S FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

46. ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

47. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting

Case 1:22-cv-00680-LCB-JLW   Document 1   Filed 08/18/22   Page 12 of 33

management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

48.     As described above, Defendant was (and still is) a fiduciary of the Plan because:

      A.     It is so named; and/or

      B.     exercised authority or control respecting management or disposition of the Plan's assets; and/or

      C.     exercised discretionary authority or discretionary control respecting management of the Plan; and/or

      D.     had discretionary authority or discretionary responsibility in the administration of the Plan.

49.     As a fiduciary, Defendant was/is required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims as the Plan here. These twin duties

are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

50. The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (internal citations omitted). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

51. In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons. *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).

52. ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted).

53. In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") provides:

> [I]n addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be liable

for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

54.     During the Class Period, Defendant did not act prudently or in the best interests of the Plan's participants because it caused Plan participants to pay excessive and unreasonable fees.

55.     During the Class Period Defendant failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees. Additionally, Defendant failed to leverage the size of the Plan to negotiate the lowest fees for Participants. Defendant instead caused the Plan and its participants to pay excessive administration fees and excessive compensation to service providers.

56.     As set forth in detail below, Defendant breached its fiduciary duties to the Plan and its participants and beneficiaries, and is, therefore, liable for its breaches under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

# SPECIFIC ALLEGATIONS

## *Improper Management of the Plan Cost the Plan's Participants Millions in Savings*

57. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

58. "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[2]

59. Higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity;' that is, the money that the portion of their

---

[2] Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited August 17, 2022).

Case 1:22-cv-00680-LCB-JLW   Document 1   Filed 08/18/22   Page 16 of 33

investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

60. Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[3] Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

61. Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "A Look at 401(k) Plan Fees," *supra*.

62. The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing*

---

[3] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited August 17, 2022).

*401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[4] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.* at 5.

### *Defendant Failed to Monitor or Control the*
### *Plan's Recordkeeping and Administrative Expenses*

63.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.

64.     Nearly all recordkeepers in the marketplace offer this range of services. The services are essentially the same. Many of the recordkeeping services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

---

[4] Available at: https://www.ici.org/pdf/per22-04.pdf (last visited August 17, 2022).

65.     The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

66.     The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

67.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are derived from investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

68.     Utilizing a revenue sharing approach is not *per se* imprudent. Plaintiff is not making a claim against Defendant merely because it used revenue sharing to pay recordkeeping fees.

69.     However, when revenue sharing is left unchecked, it can be devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense

pays for. It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." *See* Justin Pritchard, "Revenue Sharing and Invisible Fees."[5]

70.     Because revenue sharing payments are asset based, they bear no relation to actual services provided and, likewise, bear no relation to a reasonable recordkeeping fee and can provide excessive compensation. Again, it is important to emphasize that fees obtained through revenue sharing are tethered not to any actual services provided to the Plan; but rather, to a percentage of assets in the Plan and/or investments in mutual funds in the Plan. As the assets in the Plan increase, so too increases the recordkeeping fees that the recordkeeper pockets from the Plan and its participants. One commentator likened this fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber not on actual work provided but based on the amount of water that flows through the pipe. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

71.     It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees to ensure that such fees remain reasonable. *See*, *e.g.*,

_____

[5] Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited August 16, 2022).

*Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

72.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

73.    Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including

direct compensation and so-called "indirect" compensation through revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants. Additionally, to the extent prudent fiduciaries agree that recordkeepers receive interest or float income from funds transferred into or out of a plan, fiduciaries track and control these amounts as well.

74.     Third, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by similar plans, as well as the recordkeeping rates that are available in the marketplace. This will generally include conducting a request for proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

75. Defendant failed to prudently manage and control the Plan's recordkeeping costs and other compensation paid to the Plan's recordkeeper by failing to undertake any of the aforementioned steps.

76. More specifically, Fidelity has been the Plan's recordkeeper during the entirety of the Class Period.

77. Upon information and belief Defendant has failed to undertake a prudent RFP since 2016. If Defendant had undertaken a prudent RFP to compare Fidelity's compensation received from the Plan with those of others in the marketplace, Defendant would have recognized that Fidelity's compensation for recordkeeping services during the Class Period has been (and remains) unreasonable and excessive.

78. Additionally, as of December 31, 2020, the Plan had nearly $3.9 billion of assets. This is Plan participant money. Upon information and belief, Defendant agreed that anytime Plan participants deposit or withdraw money from their individual accounts, that the money will first pass through a Fidelity clearing account.

79. Upon information and belief, Defendant agreed Fidelity could keep all of the interest earned on Plan participant accounts while participant money is in Fidelity's clearing account. This is a form of indirect compensation that Fidelity receives as the recordkeeper for the Plan. However, Defendant has not tracked,

- 23 -

monitored, negotiated, or disclosed the amount of compensation Fidelity receives from income it earns from float interest income on Participant money. Defendant breached its fiduciary duty of prudence by allowing Fidelity to receive compensation from Plan participants without even knowing the amount of compensation Fidelity collects from interest on participant money.

80.     Fidelity also receives "direct compensation" from Plan participants. From 2015 to 2020 the direct compensation that Fidelity received from Plan participants, per participant, as disclosed on the Plan's 5500 disclosures filed with the Department of Labor were as follows:

| Year | Direct Recordkeeping Compensation |
|------|-----------------------------------|
| 2015 | $46.09 per participant |
| 2016 | $47.10 per participant |
| 2017 | $45.48 per participant |
| 2018 | $46.20 per participant |
| 2019 | $48.38 per participant |
| 2020 | $40.20 per participant |

81.     Plans of similar size pay no more than *$25 per participant annually – or less* for recordkeeping fees. Thus, the direct compensation that Fidelity received was – on a stand-alone basis – excessive for recordkeeping. Here, the direct compensation alone was more than double what a reasonable fee should have been.

- 24 -

82. In fact, Defendant's own recordkeeper has provided evidence supporting Plaintiff's well-pled factual allegations on this discrete issue. Fidelity's own retirement plan was recently sued. In that case, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al*., 451 F.Supp.3d 189, 214 (D. Mass. 2020).

83. But there's more. In the *Moitoso* case, Fidelity went on to stipulate as follows:

> The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and ***the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year***. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-record kept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).[6]

---

[6] *Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

84. The key takeaway from this stipulation by Fidelity, the same recordkeeper utilized in this case, is simple: Fidelity served as Labcorp's Plan's recordkeeper during much of the same time period from the *Moitoso* case when Fidelity admitted (1) ***its own plan*** didn't offer services broader or more valuable than any of the plans it served and, more importantly, (2) the value of those services ranged from between ***$14 to $17* per participant annually.**

85. Thus, Labcorp Plan fiduciaries should have negotiated for recordkeeping and administration fees of between $14 to $21 per Plan participant but failed to do so.

86. Additionally, as noted above, Fidelity did not receive only the direct compensation in addition to the float interest compensation on Plan participant's money discussed above—it received even more compensation for recordkeeping services through revenue sharing payments. Such revenue-sharing payments are particularly problematic because they are asset-based, and they usually bear no relation to a reasonable recordkeeping fee. Rather, in large plans, like this one, revenue sharing often results in excessive compensation, especially in multi-billion dollar plans like the one here.

87. As one industry expert has noted: "If you don't establish tight control, the growth of your plan's assets over time may lead to higher than reasonable amounts getting paid to service providers. This is because most revenue sharing is

asset-based. If a recordkeeper's workload is about the same this year as last, why should they get more compensation just because the market had a big year and inflated the asset base? In a large plan, this phenomenon can lead to six figure comp bloat over time. That's bad for plan participants and bad for fiduciaries." Jim Phillips, *(b)est Practices: What Do You Know About Revenue Sharing?*, PLANSPONSOR.com (June 6, 2014).

88. The best practice is a flat price based on the number of participants in a plan, which ensures that the amount of compensation will be tied to the actual services provided and that the recordkeeping fees will not fluctuate or change based upon, *e.g.*, an increase in assets in the plan.

89. The 2020 Form 5500 filed with the U.S. Department of Labor reveals Fidelity received (and continues to receive) "indirect" compensation via recordkeeping. Notably, however, at the same time the 5500 then lists the purported indirect" compensation amount paid to Fidelity as "$0". The total amount of recordkeeping fees (both through direct and indirect payments) currently is at least $150 per participant annually, when a reasonable fee ought to be no more than $25 per participant annually.

90. The recordkeeping fees paid to Fidelity are far greater than recognized reasonable rates for a plan with nearly $3.9 billion in assets. Given the growth and size of the Plan's assets during the Class Period, in addition to the general trend

towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to superior to the typical services that would have been provided to the Plan by Fidelity.

91.     Fidelity performs tasks for the Plan such as validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping, and information management (computing, tabulating, data processing, etc.).

92.     The services that Fidelity provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive fees being paid to the recordkeepers and taken corrective action.    Defendant's failure to monitor and control recordkeeping compensation cost the Plan millions of dollars during the Class Period and constituted a breach of the duty of prudence.

93.     Looking at recordkeeping costs for other plans of a similar size shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees. The chart below analyzes a few well managed plans having tens of thousands of participants with billions of dollars in assets under management, like the Plan:

| Name of Plan | Number of Participants | Value of Plan Assets | Total Reported Recordkeeping and Administrative Service Costs | Recordkeeping and Administrative Costs Per-Participant[7] | Record Keeper |
|---|---|---|---|---|---|
| The Dow Chemical Company Employees' Savings Plan | 37,868 | $10,913,979,302 | $932,742 | $25 | Fidelity |
| The Savings and Investment Plan [WPP Group] | 35,927 | $3,346,932,005 | $977,116 | $27 | Vanguard |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 46,943 | $3,793,834,091 | $1,526,401 | $33 | Fidelity |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $930,019 | $30 | Alight |

94.     Thus, if the Plan were a standalone plan, with over 55,000 participants

and $3.9 billion in assets in 2020, Defendant should have been able to negotiate a

---

[7] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. See Instructions for Form 5500 (2019) at pg. 27 (defining each service code), available at https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/ reporting-and-filing/form-5500/2019-instructions.pdf.

recordkeeping cost anywhere from $14 per participant to $25 from the beginning of the Class Period to the present. However, Defendant simply failed to do so.

95.     In sum, given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, Defendant could have obtained for the Plan recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.  Defendant failed to do so and, as a result, violated its fiduciary duties under ERISA.

## FIRST CLAIM FOR RELIEF
### *Breaches of Fiduciary Duties of Prudence*

96.     Plaintiff re-alleges and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

97.     As a fiduciary of the Plan, Defendant was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

98. Defendant breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Defendant failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

99. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

100. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendant is liable to restore to the Plan all losses caused by its breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in the Prayer for Relief.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

1. Find and declare that the Defendant breached its fiduciary duties as described above;

2. Find and adjudge that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to

otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.      Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.      Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

5.      Remove fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.      Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.      Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

8.      Certify the Class, appoint the Plaintiff as class representative, and appoint her counsel as Class Counsel;

9.      Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10.     Order the payment of interest to the extent it is allowed by law; and

11.     Grant other equitable or remedial relief as the Court deems appropriate.

DATED this the 18th day of August, 2022.

Respectfully submitted,

*/s/ Matthew Norris*
**J. MATTHEW NORRIS**
NC Bar No. 37206
**NORRIS LAW FIRM, PLLC**
1776 Heritage Center Drive, Suite 204
Wake Forest, NC 27687
Telephone:  (919) 981-4475
Facsimile:  (919) 926-1676
Email:  matt@lemonlawnc.com


**BRANDON J. HILL** (*pro hac vice application forthcoming*)
Florida Bar Number: 37061
**LUIS A. CABASSA, P.A.** (*pro hac vice application forthcoming*)
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK** (*pro hac vice application forthcoming*)
Florida Bar Number: **0285020**
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Direct: 813-337-7992
Main: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com


**MICHAEL C. MCKAY** (*pro hac application forthcoming*)
Arizona Bar Number 023354
**MCKAY LAW, LLC**
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mckay@mckay.law

- 33 -