# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### 1:22-cv-680

**DAMIAN MCDONALD,**
**on behalf of the Laboratory**
**Corporation of America Holdings**
**Employees' Retirement Plan, himself,**
**and all others similarly situated,**

      **Plaintiff,**

      **v.**

**LABORATORY CORPORATION**
**OF AMERICA HOLDINGS,**

      **Defendant.**
_____

## FIRST AMENDED CLASS ACTION COMPLAINT

1.      This action seeks to protect the retirement savings of more than 55,000 Laboratory

Corporation of America Holdings ("LabCorp") employees who are participants in the Laboratory

Corporation of America Holdings Employees' Retirement Plan ("Plan").

2.      LabCorp has a fiduciary duty to ensure that its Plan does not charge excessive fees

to Plan participants. But over the past six years, Plan participants have paid more than

$30,000,000.00 (thirty million) in administrative fees. The fees are nearly ten times what they

should be. They are grossly excessive. Plan participants will continue to pay grossly excessive fees

unless this action moves forward.

3.      In addition, LabCorp has a fiduciary duty to prudently select and monitor

investments offered through the Plan. The Plan is eligible – given its massive size and economies

of scale – for discounted pricing on investments. Instead of taking advantage of favorable pricing,

LabCorp caused Plan participants to pay more for investments than what they were eligible for

and more than what they should have paid. Over the past six years, Plan participants have paid an estimated $750,000.00 in excessive investment related fees.

4.    Damian McDonald ("Plaintiff") brings this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce liability under 29 U.S.C. §1109(a) and to restore to the Plan all losses resulting from LabCorp's breaches of fiduciary duty.

## JURISDICTION AND VENUE

5.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

6.    This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, and where at least one of the alleged breaches took place.

## ERISA

7.    The ERISA fiduciary duty of prudence is among "the highest known to the law" and requires fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As a fiduciary to the Plan, LabCorp is obligated to act for the exclusive benefit of the Plan and to ensure that the Plan's expenses are reasonable. *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

8.    "ERISA is a remedial statute designed to protect the interests of plan participants and beneficiaries….Courts should not hasten to employ technical rules of pleading and practice to

- 2 -

defeat that goal." *Degnan v. Publicker Industries, Inc.*, 83 F.3d 27, 30 (1st Cir. 1996). This principal favors liberal construction of pleadings. *Fitzgerald v. Codex Corp.*, 882 F.2d 586, 589 (1st Cir. 1989); *see also Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund*, 933 F. Supp. 1124, 1134 (D. Mass. 1996).

9.     While everyone who participates in a 401(k) plan pays fees to maintain their account, industry insiders report that over 70% of people do not believe they pay any fees. In an effort to help the public obtain a better grasp on fees they pay in retirement plans, the Department of Labor passed regulations in 2012 that require plan administrators to disclose fee and expense information to plan participants. However, most plan participants are still in the dark concerning the actual amount of fees they pay. The lack of understanding is not surprising. Often fees are hidden from plain view. In many cases, plan providers do not make the fee and expense disclosures that the Department of Labor requires.

10.     Such is the case here. The account statements that LabCorp provides to its Plan participants do not disclose the fees paid to third party service providers by Plan participants. In addition, the Plan's Annual Form 5500 Department of Labor reports are supposed to identify the fees paid to third parties, but as discussed below, they do not.

11.     LabCorp fiduciary obligations with respect to the Plan are especially important because Plan participants cannot negotiate fees charged to Plan participants. Plan participants must trust that LabCorp will prudently do so. LabCorp is also responsible for selecting investments and hiring service providers for the plan. These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1-

2 (Aug. 2013).

12.     That is, if a person placed $25,000 in a retirement account, made no other contributions to the account for 35 years, averaged a 7% return for 35 years, and paid .5% in fees, the account balance will grow to $227,000. But if the fees are increased by just 1%, the 1% increase costs a staggering $64,000, or 28% of the retirement savings.

13.     Accordingly, LabCorp must engage in a rigorous process to control fees and ensure that Plan participants pay no more than a reasonable level of fees. This is particularly true for billion-dollar plans like the Plan here, which has the bargaining power to obtain the highest level of service and the lowest fees. The fees available to billion-dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

14.     The entities that provide administrative services and investments to retirement plans have a strong incentive to maximize their fees. Each dollar in fees paid from participants' retirement savings reduce by the same amount participants' retirement savings, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, monitor, and reduce a plan's fees.

15.     Plan fiduciaries must be cognizant that self-interested third parties seek to maximize fees from plans, and fiduciaries may not simply accede to demands, or agree to quotes without negotiating or considering alternatives. In order to act in the exclusive interest of a Plan and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake.

**THE PLAN**

16.     The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

- 4 -

17.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

18.     LabCorp is a statutory fiduciary to the Plan.

19.     Eligible current and former employees of LabCorp are eligible to participate in the Plan. The Plan provides the primary source of retirement income for many former LabCorp employees.

20.     Defined contribution retirement plans are generally classified as follows: "Micro" plans (<$5 million in assets); "Small" plans ($5 million-<$50 million); "Mid" plans ($50 million-<$200 million); "Large" plans ($200 million-<$1 billion); and "Mega" plans (>$1 billion).

21.     As of December 31, 2020, the Plan had $3,887,103,000 in assets and 55,355 participants with account balances. The Plan qualifies as a "mega" plan in the 401(k) marketplace.

22.     Instead of leveraging the Plan's tremendous bargaining power to benefit Plan participants, LabCorp caused the Plan to pay unreasonable and excessive fees.

## THE PARTIES

23.     Plaintiff is currently employed by LabCorp. He is a Plan participant.

24.     Plaintiff has statutory standing to bring this action because 29 U.S. §1132(a)(1) allows a plan participant to file a civil action that seeks relief on behalf of a plan. Here, the Plan suffered millions of dollars in losses caused by LabCorp's fiduciary breaches. Plaintiff alleges that he and Plan participants suffered the same losses resulting from LabCorp's ERISA violations. All relief in this action sought by Plaintiff is on behalf of the Plan.

25.     To establish Constitutional standing (or Article III standing), Plaintiff need only show a concrete and particularized injury flowing from LabCorp's ERISA fiduciary breaches. Plaintiff alleges his individual account in the Plan suffered losses because his account was assessed

excessive fees, which would not have been incurred had LabCorp discharged its ERISA fiduciary duties to the Plan and ensured fees were reasonable. That money (millions of dollars) should have gone towards retirement; instead, it went elsewhere. Accordingly, Plaintiff alleges concrete and particularized injuries. Plaintiff also has standing because he is seeking injunctive and equitable relief on behalf of the Plan.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the following proposed class ("Class"):

> All persons who were participants in or beneficiaries of the Plan, at any time between November 8, 2016, and the present (the "Class Period").

27.     The members of the Class are so numerous that joinder is impractical. According to the Plan's Annual Form 5500 for the year ending 2020, filed with the U.S. Department of Labor, there were 55,355 Plan participants with account balances as of December 31, 2020.

28.     Plaintiff's claims are typical of Class members' claims. Like other Class members, Plaintiff participated in the Plan and suffered injuries because of LabCorp's ERISA fiduciary breaches. LabCorp treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and Class members' claims arise out of the same conduct, policies, and practices of LabCorp as alleged herein, and all members of the Class have been similarly affected by LabCorp's ERISA violations.

29.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.      Whether LabCorp is a fiduciary of the Plan;

B.      Whether LabCorp breached its fiduciary duty of prudence by engaging in the conduct described herein;

C.      Whether LabCorp failed to prudently monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.      Whether LabCorp caused the Plan to pay excessive fees for administrative services;

E.      Whether LabCorp caused the Plan to pay excessive fees for investments;

F.      The proper form of equitable and injunctive relief; and

G.      The proper measure of relief.

30.      Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other Class members. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this action as a class action.

31.      This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for LabCorp. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

- 7 -

32.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because LabCorp has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## EXCESSIVE ADMINISTRATIVE FEES

33.     Plan administrative services are sometimes called recordkeeping services. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These administrative services are largely commodities, and the market for them is highly competitive.

34.     Nearly all recordkeepers in the marketplace offer the same range of services. Many of the recordkeeping services can be provided by recordkeepers at very little cost.

35.     The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, recordkeepers vigorously compete for business by offering the best price.

36.     The cost of providing recordkeeping services depends mainly on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

Case 1:22-cv-00680-LCB-JLW     Document 15     Filed 11/14/22     Page 8 of 38

37. Recordkeeping expenses can be paid directly from plan assets, or indirectly by taking money from plan participants' individual accounts (or a combination of both).

38. In a typical "direct" recordkeeping fee arrangement, the plan contracts with a recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing services - for example, $30.00 per year, per plan participant.

39. A flat price based on the number of participants in the plan ensures that the amount of compensation is tied to actual services provided and does not grow based on matters that have nothing to do with actual services provided by a recordkeeper, such as an increase in plan assets due to market growth, or greater plan contributions by employees.

40. By way of illustration, a plan with 30,000 participants and $3 billion in assets may issue a request for proposal to several recordkeepers and request that the recordkeepers provide pricing based on a flat rate for a 30,000-participant plan. If the winning recordkeeper offers to provide the recordkeeping services at a flat rate of $30.00 per participant, per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $900,000 direct annual fee (30,000 participants at $30.00 per participant). If the plan's assets double and increase to $6 billion during the course of the contract but the participant level stays constant, the recordkeeper's compensation does not double as the plan assets did.

41. Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $30.00 fee from his or her account. The plan could reasonably determine that assessing the same fee to all participants would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case,

the flat per participant rate of $30.00 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $3 billion plan in this example, each participant would pay a direct administrative fee of 0.03% of his or her account balance annually for recordkeeping ($900,000/$3,000,000,000 = 0.0003). If plan assets increase thereafter, the percentage would be adjusted downward so that the plan is still paying the same $900,000 price that was negotiated at the plan level for services to be provided to the plan.

42.     Recordkeepers in the marketplace offer an array of other fee and expense models. These often include some combination of dollar-per-head and asset-based approaches. Plaintiff here is specifically not alleging that LabCorp was required to use a direct payment arrangement – or any specific payment arrangement for that matter. Rather, Plaintiff is simply providing details on how direct payment methods operate and provides these details to partially illustrate (together with all the allegations herein) that the recordkeeper fees the Plan participants are paying are excessive and that LabCorp should have done more to investigate, monitor, request, negotiate, and secure reasonable fees for the Plan.

43.     The Plan's recordkeeper is Fidelity Workplace Services, LLC ("Fidelity"). Fidelity receives direct and indirect fees from the Plan.

44.     Fidelity receives a direct fee of at least $40.00 annually from Plan participants. A reasonable fee for recordkeeping ought to be no more than $25.00 annually. Accordingly, Fidelity's direct fee alone is nearly double what it ought to be. But it gets much worse.

45.     Fidelity also receives indirect fees. Fidelity receives indirect fees in two material ways. First, Fidelity receives fees via "float" on Plan participant money. Second, Fidelity receives fees via a practice known as revenue sharing.

- 10 -

46.    With regard to fees via float, LabCorp agreed that anytime Plan participants deposit or withdraw money from their individual accounts in the Plan that the money will first pass through a Fidelity clearing account. Plan participant money typically sits in Fidelity's clearing account for 2-3 days. LabCorp also agreed Fidelity could keep the investment returns and/or any interest earned on Plan participant money while the money is in Fidelity's clearing account. This is a form of indirect compensation that Fidelity receives as the recordkeeper for the Plan. The Plan's Annual Form 5500 for the year ending 2020 shows that more than $1 billion dollars were transferred in and out of the Plan. However, LabCorp has not tracked, monitored, nor negotiated the amount of compensation Fidelity receives from the income it earns on Plan participant money while the money is in Fidelity's clearing account. If Fidelity earned 1% on $1 billion, then Fidelity pocketed $10 million in float income for 2020 alone. LabCorp breached its fiduciary duty of prudence by allowing Fidelity to receive compensation from Plan participants without even knowing the amount of compensation Fidelity collects from interest on participant money as to the float, and because the amount of indirect compensation Fidelity receives via float is excessive relative to the services provided and relative to prudent options in the marketplace.

47.    Fidelity also receives indirect compensation via revenue sharing. In a revenue-sharing arrangement, the amount of compensation for recordkeeping services to a plan is not based on the actual value of such services. Instead, compensation is based on the amount of assets in the plan, or the amount of assets in certain investments in the plan. For example, the recordkeeper will agree to a fee that is tethered to the amount of assets in a plan. The fees will grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, does not increase at a similar rate. By way of example, if a recordkeeper contracts to receive one percent annually of assets in the plan as indirect compensation for a plan with 100 participants and

- 11 -

$300,000 in plan assets, the recordkeeper would receive $3,000 per year in fees, or $30.00 on a per plan participant basis. But if the plan assets increased to $300,000,000 – and the contract remains the same, the recordkeeper receives $3,000,000 per year in fees, or $30,000 per plan participant. This would be an excessive fee by any measure.

48.     Revenue sharing, while not a per se violation of ERISA, can lead to massively excessive fees if not properly understood, monitored, and capped. If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, or other fee models that are being used in the marketplace, and (3) ensure the plan pays a reasonable amount of fees.

49.     Self-interested recordkeepers prefer fee agreements that allow them to receive "direct" and "indirect" payments for recordkeeping. Recordkeepers often tout the direct fees they collect as being "reasonable" while they surreptitiously take much money from Plan participants via indirect fees. Such is the case here.

50.     Recordkeepers often attempt to construct their fee agreements so that their fees are not solely tied to any actual services, but to the amount of assets in a plan (*i.e.*, float and revenue sharing). That way, as Plan assets increase, so do the recordkeeper's fees. Utilizing an approach that allows recordkeepers to collect fees indirectly is not *per se* imprudent. Plaintiff is not making a claim against LabCorp merely because it allowed the Plan's recordkeeper to pocket direct and indirect fees. However, as is the case here, when indirect fees are left unchecked, they can be devastating for Plan participants. As one commentator noted, "[A]t worst, revenue sharing (one source of indirect fees) is a way to hide fees. Nobody sees the money change hands, and very few

understand what the total investment expense pays for. It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." *See* Justin Pritchard, "Revenue Sharing and Invisible Fees."[1]

51.     One commentator likened a revenue-sharing fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber based on the amount of water that flows through the pipe rather than the actual work provided. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

52.     It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid to the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

53.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents

---

[1]  Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited November 8, 2022).

that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

54.     Second, make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and so-called "indirect" compensation through revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants. Additionally, to the extent prudent fiduciaries agree that recordkeepers receive interest or float income from funds transferred into or out of a plan, fiduciaries track and control these amounts as well.

55.     Third, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by similar plans, as well as the recordkeeping rates that are available in the marketplace. This will generally include conducting a request for proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

56. LabCorp failed to conduct RFPs at reasonable intervals.

57. Simply put, in this case, the fees Fidelity extracted from the Plan are excessive in relation to the specific services Fidelity provided to the Plan.

58. The services offered by Fidelity are offered by all recordkeepers. The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services. All national recordkeepers have the capability to provide recordkeeping services at very little cost to all large defined contribution plans

59. Here, LabCorp failed to prudently manage and control the Plan's recordkeeping costs and other compensation paid to Fidelity.

60. Fidelity has been the Plan's recordkeeper during the entirety of the Class Period. In fact, Fidelity has been the Plan's recordkeeper since at least 2012.

61. LabCorp failed to obtain competitive bids ("RFP") during the Class Period which, in turn, has caused the Plan to overpay for recordkeeping during the entire Class Period.

62. By going through an RFP process annually, or at least every three years—rather than not at all—a prudent plan fiduciary can review the level of service provided by the recordkeeper and compare fees in the marketplace to those being offered by the current recordkeeper. This also allows the plan fiduciary to negotiate with its current provider for a lower fee and/or move to a new provider to provide the same or better services for a more competitive and reasonable fee.

63. Besides failing to engage in the RFP process, LabCorp's own documents fail to accurately disclose how much Fidelity is paid from the Plan in terms of either direct and/or indirect compensation. By way of specific example, in 2020, LabCorp's Annual Form 5500 Report, which

- 15 -

is a mandatory disclosure that is supposed to provide accurate information and the Plan's fees and expenses, LabCorp states that Fidelity was paid $2,419,605 in "direct compensation."

64.     Below is screenshot of the information reported as to Fidelity's $2,419,605 "direct compensation":

**FIDELITY INV. INSTITUTIONAL OPS CO**

**04-2647786**

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 37 64 65 | RECORDKEEPER | 2419605 | Yes ☒ No ☐ | Yes ☒ No ☐ | 0 | Yes ☒ No ☐ |

65.     Inexplicably, however, later in the same document LabCorp claims that it caused the Plan to pay $2,225,503 in "total administrative expenses" in 2020. That means that somehow $194,102 in direct compensation paid to Fidelity was omitted entirely from LabCorp's "total administrative expenses" computation in its Annual Form 5500 Report for 2020. Below is a screenshot capturing this glaring error:

**Expenses**

| | | | | |
|---|---|---|---|---|
| e | Benefit payment and payments to provide benefits: | | | |
| | (1) Directly to participants or beneficiaries, including direct rollovers.......... | 2e(1) | 221641978 | |
| | (2) To insurance carriers for the provision of benefits ..................................... | 2e(2) | | |
| | (3) Other..................................................................................................... | 2e(3) | | |
| | (4) Total benefit payments. Add lines 2e(1) through (3) ................................. | 2e(4) | | 221641978 |
| f | Corrective distributions (see instructions) ......................................................... | 2f | | 39253 |
| g | Certain deemed distributions of participant loans (see instructions)................... | 2g | | 213483 |
| h | Interest expense................................................................................................ | 2h | | |
| i | Administrative expenses: (1) Professional fees ............................................... | 2i(1) | | |
| | (2) Contract administrator fees ....................................................................... | 2i(2) | | |
| | (3) Investment advisory and management fees ................................................ | 2i(3) | 143896 | |
| | (4) Other......................................................................................................... | 2i(4) | 2081607 | |
| | (5) Total administrative expenses. Add lines 2i(1) through (4) ....................... | 2i(5) | | 2225503 |

66.     Not only did LabCorp make a nearly $200,000 error when reporting the direct compensation paid to Fidelity in its 5500 for the year 2020, LabCorp's own documents *prove* it.

- 16 -

67. Plans of similar size pay no more than $25 per year per participant for all recordkeeping fees.

68. Notably, in documents made available to Plaintiff thus far, when calculated on a per-participant basis, LabCorp disclosed allowing Fidelity to charge the Plan the following in direct compensation: 2020 ($40); 2019 ($46.55); 2018 ($45.49); 2017 ($44.90); 2016 ($47.04); and, finally, 2016 ($46.09)

69. Here, the "direct compensation" LabCorp admits it caused the Plan to pay Fidelity in 2020 alone was nearly 1.5 times what a reasonable fee should have been.

70. During the Class Period the direct compensation that Fidelity received from the Plan was indisputably far more than LabCorp disclosed causing the Plan participants to pay.

71. For example, just based on the amounts disclosed by LabCorp in the Plan's Annual 5500 Reports from 2015 to 2020, Fidelity received at least the following direct compensation from the Plan:

- $2,419,605 for the year 2020 during which there were 55,355 Plan participants with active account balances—equivalent to $43.71 per participant annually rather than the $40 amount disclosed in Plaintiff's statements;

- $2,039,760 for the year 2019 during which there were 43,814 Plan participants with active account balances—equivalent to $46.55 per participant annually rather than the $32.00 amount disclosed in Plaintiff's statements;

- $2,054,241 for the year 2018 during which there were 45,157 Plan participants with active account balances—equivalent to $45.49 per participant annually rather than the $30.50 amount disclosed in Plaintiff's statements;

- $1,952,568 for the year 2017 during which there were 43,481 Plan participants with active account balances—equivalent to $44.90 per participant annually;

- 17 -

- $1,849,058 for the year 2016 during which there were 39,308 Plan participants with active account balances—equivalent to $47.04 per participant annually;

- $1,822,414 for the year 2015 during which there were 39,537 Plan participants with active account balances—equivalent to $46.09 per participant annually;

72.     Thus, the per-participant direct recordkeeping compensation paid by the Plan to Fidelity was closer to the following:

| Year | Direct Recordkeeping Compensation Paid to Fidelity Reported in Annual 5500 | Direct Recordkeeping Compensation Paid to Fidelity Reported in Client Docs | Difference | Number of Participants | Total Difference in Terms of Overall Cost to Plan |
|---|---|---|---|---|---|
| 2020 | $43.71 | $40.00 | $3.71 | 55,355 | $205,367.05 |
| 2019 | $46.55 | $32.00 | $14.55 | 43,814 | $637,493.70 |
| 2018 | $45.49 | $30.50 | $14.99 | 45,157 | $676,904.43 |
| 2017 | $44.90 | Not available to Plaintiff | n/a | n/a | n/a |
| 2016 | $47.04 | Not available to Plaintiff | n/a | n/a | n/a |
| 2015 | $46.09 | Not available to Plaintiff | n/a | n/a | n/a |
| **Total** | | | | | **$1,519,765,18** |

73.     But there's more, much more in fact, in terms of excessive fees LabCorp caused the Plan to pay Fidelity. As noted above, Fidelity did not receive only the direct compensation—it received even more compensation for recordkeeping services through indirect payments. However, those amounts are simply not disclosed to Plan participants, like Plaintiff.

- 18 -

74. Instead, LabCorp's Annual Fee Disclosure uses the following double-speak to disclose the revenue sharing arrangement with Fidelity without disclosing the amount participants (much less the Plan) pay Fidelity:

**Asset-Based Fees**

Asset-based fees reflect an investment option's total annual operating expenses and include management and other fees. They are often the largest component of retirement plan costs and are paid by all shareholders of the investment option. Typically, asset-based fees are reflected as a percentage of assets invested in the option and often are referred to as an "expense ratio." You may multiply the expense ratio by your balance in the investment option to estimate the annual expenses associated with your holdings. Refer to Section 3 of this Notice for information about the Plan's investment options, including their expense ratios (where applicable).

Asset-based fees are deducted from an investment option's assets, thereby reducing its investment return. Fee levels can vary widely among investment options, depending in part on the type of investment option, its management (including whether it is active or passive), and the risks and complexities of the option's strategy. In some instances, a plan's administrative services may be paid for through offsets and/or payments associated with a plan's investment options.

75. LabCorp's Annual Form 5500 Reports do not disclose the amount of any "indirect" fees Fidelity collects, but it does disclose that Fidelity receives such fees, as evidenced by the following screenshot:

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

FIDELITY INV. INSTITUTIONAL OPS CO

04-2647786

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 37 64 65 | RECORDKEEPER | 2419605 | Yes [X] No [ ] | Yes [X] No [ ] | 0 | Yes [X] No [ ] |

- 19 -

76.     Once again, while LabCorp admits Fidelity is paid "indirect compensation," at the same time LabCorp discloses that amount as "0" and then claims that Fidelity provided it with a "formula instead of an amount or estimated amount." The problem with this, of course, is that LabCorp fails to disclose to Plaintiff or Plan participants what that alleged formula is, much less what application of that formula translates to in terms of the amount of "indirect compensation" plan participants are paying to Fidelity.

77.     The indirect fees paid to Fidelity are far greater than recognized reasonable rates for a plan with more than $3.8 billion in assets. Given the growth and size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to superior to the typical services that would have been provided to the Plan by Fidelity.

78.     As to the plan at issue here, Fidelity performs tasks for the Plan such as validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping, and information management, including computing, tabulating, and data processing.

79.     The fees described above were and remain excessive in relation to the services that the plan provided because, in fact, the services that Fidelity provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive fees being paid to the recordkeepers and taken corrective action.

80.     LabCorp's failure to monitor and control recordkeeping compensation cost the Plan millions of dollars during the Class Period and constituted a breach of the duty of prudence.

81.     Looking at recordkeeping costs for other plans of a similar size as of 2020 shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees.

82.     The chart below compares the Labcorp 401(k) Plan to comparable plans with similar numbers of participants and assets under management for the year 2020 that also used Fidelity as a recordkeeper:

| Name of plan | Record-keeper | Total # participants w/ account balances | Dollar value of plan assets | Total reported recordkeeping and administrative service costs | Record-keeping and admin-istrative service costs per-participant basis[2] | Service codes |
|---|---|---|---|---|---|---|
| Sutter Health 403(b) Savings Plan (2020) | Fidelity | 67,149 | $5,565,602,878 | $1,719,469 | $25 | 37, 60, 64, 65 |
| Cisco Systems, Inc. 401(k) Plan (2020) | Fidelity | 59,460 | $16,306,454,000 | $1,324,571 | $22.27 | 37, 60, 64, 65, 71 |
| **Labcorp 401(k) Plan (2020)** | **Fidelity** | **55,355** | **$3,887,103,000** | **$2,419,605** | **$43.71** | **37, 64, 65** |
| The Progressive 401(k) Plan (2020) | Fidelity | 40,849 | $6,889,657,978 | $267,341 | $6.54 | 37, 64, 65, 71 |

[2] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. *See* Instructions for Form 5500 (2020) at pg. 27 (defining each service code), available at https://www .dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/ reporting-and-filing/form-5500/2020-instructions.pdf.

| Wegmans Retirement Plans (2020) | Fidelity | 35,297 | $2,897,279,417 | $146,520 | $7.12 | 37, 60, 64, 65, 71 |
|---|---|---|---|---|---|---|

83.     According to the Department of Labor, the applicable service codes translate as follows: 37 = Participant loan processing; 60 = Sub-transfer agency fees; 64 = Recordkeeping fees; 65 = Account maintenance fees; 71 = Securities brokerage commissions and fees.[3] Service codes contained in a 5500 "describe both the kind of services provided and the type of compensation received."[4]

84.     Importantly, the above benchmarking compares only fees paid to the above five plans' recordkeepers only as to direct compensation paid to similar plans' recordkeepers which, in all five of the examples, is Fidelity. Thus, LabCorp caused its Plan to pay Fidelity excessive fees for the same services that Fidelity offered the comparator plans for much less . Plaintiffs anticipated expert witness reports will expand on the benchmarking herein and demonstrate conclusively that the Plan paid excessive and unreasonable fees.

85.     The Annual Form 5500 Reports from these various plans also demonstrate that, in fact, many of the recordkeeping services offered by Fidelity to the Plan here are/were similar to the above comparator plans. In fact, they are nearly identical, but done for $25 or less, per participant, annually.

86.     For example, the service codes from the 5500 for the LabCorp 401(k) Plan from 2020 indicate that Fidelity performed the following discrete activities in 2020 for which it collected

---

[3] *See* Instructions for Form 5500 (2020) at pg. 27 (defining each service code), available at https://www .dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/ reporting-and-filing/form-5500/2020-instructions.pdf.
[4] *Id.*

fees in the form of direct compensation: participant loan processing (5500 service code "37"); recordkeeping (service code "64"); and account maintenance (service code "65").

87.     The first comparator plan is the Sutter Health 403(b) Savings Plan. It filed an Annual 5500 Report in 2020 reporting that it recordkeeper, Fidelity—the same recordkeeper LabCorp uses—performed and was paid for the same kind of services that LabCorp's recordkeeper performed. More specifically, the Sutter plan reported Fidelity performed the following discrete activities in 2020 for which it collected fees in the form of direct compensation: 37 = participant loan processing; 60 = sub-transfer agency; 64 = recordkeeping; and 65 = account maintenance.

88.     By way of comparison, excluding sub-transfer agency work, Fidelity performed the exact same services for the LabCorp Plan.  However, participants in the Sutter plan paid only $25 annually to Fidelity in direct compensation while LabCorp Plan participants paid at least $40, not including the undisclosed indirect compensation Fidelity also received.

89.     The same is true for the second comparator plan, Cisco Systems, Inc, a plan that is very comparable in terms of the number of participants. The Cisco plan has about 59,000 participants and 55,000 in the LabCorp Plan. The service codes from the Cisco Plan's Annual 5500 Report indicate that Cisco's recordkeeper, Fidelity—again the same recordkeeper used by LabCorp—performed basically the same work for both the Cisco and LabCorp plans. This is demonstrated by the use of the 5500-service codes "37," "64", and "65" when describing the kind of services provided and the type of compensation received by Fidelity for both the Cisco and LabCorp plans.  The only real substantive difference is that Fidelity performed the same work for the Cisco plan at nearly half the cost.

90.     Much of the same is true for the third comparator plan, The Progressive 401(k) plan.  Once again, just like LabCorp, the Progressive 401(k) plan used Fidelity as its recordkeeper.

The plans are of similar size in terms of assets and participants. Not only that, a comparison of the services codes, as applied to the work and services for which Fidelity was paid for both plans, reveals that, in fact, Fidelity basically did the same work for both plans. However, LabCorp caused its plan participants to pay between six (6) to eight (8) times more than Progressive participants paid for the same work performed by the same recordkeeper for the same sizedplan. This is demonstrated by the fact that both plans share the same core service codes, specifically 37, 64, 65, when describing the work Fidelity performed for the two plans.

91.     The same is also true for the fourth comparator, the Wegmans Retirement Plans.  It is also a mega plan of similar size in terms of assets and participants. A comparison of the services codes applied to the work and services for which Fidelity was paid for Wegmans and LabCorp reveals that, in fact, Fidelity basically did the same work for both plans.  However, LabCorp caused its Plan participants to pay between five (5) and seven (7) times what Wegmans' participants paid for the same work performed by the same recordkeeper for the same size of plan. This is demonstrated by the fact that both plans share the same core service codes, specifically 37, 64, 65, when describing the work Fidelity performed for the two plans.

92.     Simply put, each of the above plans are comparable because the plans are of similar size in both participants and assets and, more importantly, because Fidelity is the recordkeeper for each and performed nearly identical services for each. Thus, based on the comparator plans, if the Plan were a standalone plan, with over 55,000 participants and over $3,887,103,000 dollars in assets in 2020, LabCorp should have been able to negotiate a total recordkeeping fee of $25, at most, from the beginning of the Class Period to the present.

93.     As demonstrated by these benchmarks, considering that the recordkeeping services provided by Fidelity in this case are similar to those provided by all national recordkeepers, like

- 24 -

Fidelity, LabCorp's decision to cause the Plan and its participants to pay at least $40 in direct compensation to Fidelity through 2020, is both imprudent and in violation of ERISA.

94.     And this, of course, is only the direct compensation LabCorp admits to causing the Plan to pay Fidelity. In reality, based on the documents available to Plaintiff thus far, by adding the indirect compensation to the direct compensation paid to Fidelity, the true total compensation paid to Fidelity was approximately $100 to $150 per participant. The Plan, due to its number of participants and assets, had the leverage to negotiate much cheaper recordkeeping costs but failed to do so.

95.     In fact, Fidelity has actually provided evidence supporting Plaintiff's position on this discrete issue.  Fidelity's own retirement plan was recently sued.  In that case, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D. Mass. 2020).

96.     Additionally, in the *Moitoso* case Fidelity went on to stipulate as follows:

> The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017, is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-record kept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).[5]

_____

[5] *Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2.

97.     The key takeaway from this stipulation by Fidelity, the same recordkeeper utilized in this case, is simple: Fidelity served as LabCorp's Plan's recordkeeper during the same time period from the *Moitoso* case when Fidelity admitted: (a) its own plan did not offer services broader or more valuable than any of the plans it served and, more importantly, (b) the value of those services ranged from between $14.00 to $17.00 per participant annually. Thus, for LabCorp to permit Fidelity to charge its Plan in excess of $40.00 per participant annually in direct compensation alone is both imprudent and a violation of its fiduciary duty. When coupled with the indirect compensation, LabCorp permitted Fidelity to charge the Plan upwards of $150.00 per year for recordkeeping.

98.     To be clear, even the $40.00 in direct compensation LabCorp's documents prove that it caused the Plan to pay as to the Named Plaintiff and the putative class members in 2020 for recordkeeping and administrative services is, in fact, excessive for the specific services performed by Fidelity *in this case*, and *as to this* Plan.

99.     As explained above, the services codes from the Labcorp 5500 describe both the kind of services provided and the type of compensation received via utilization of the codes 37, 64, 65. Those codes translate as follows: 37 = Participant loan processing; 64 = Recordkeeping fees; 65 = Account maintenance fees. These recordkeeping services provided by Fidelity in this case are similar to those provided by all national recordkeepers, including Fidelity, to similar mega-sized plans.

100.    LabCorp could have and should have used the Plan's increasing size and long-standing relationship with Fidelity as bargaining power to reduce the Plan's recordkeeping costs.

101.    At a minimum, LabCorp should have but failed to hire a consultant to benchmark the Plan's administrative costs or engaged in an objective, competitive process to hire a

- 26 -

recordkeeper who would provide the same or similar services without pocketing excessive fees from the Plan. LabCorp's failure to perform these basic, but prudent, fiduciary actions constitutes a clear violation of ERISA.

102.    LabCorp allowed excessive compensation to be paid to Fidelity during the Class Period because when the Plan's assets grew, so did Fidelity's fees even though its duties, services, and costs did not grow in proportion. This ought to be beyond a good faith dispute. Indeed, according to the Plan's Annual 5500 Report for year ending 2016, the Plan had assets of $1,417,141,111 (about $1.4 billion). According in the Plan's Annual 5500 Report for year ending 2020, the Plan had assets of $3,891,080,771 (about $4 billion). The Plan's assets have more than doubled in the past few years. Fidelity's indirect compensation has skyrocketed to excessive and unreasonable levels simply because the Plan's assets have increased.

103.    In sum, given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, LabCorp could have obtained for the Plan recordkeeping services that were comparable to or superior to the typical services provided by Fidelity at a lower cost – likely by Fidelity itself – had LabCorp acted as a prudent fiduciary would have under the circumstances. But LabCorp failed to do so and, as a result, violated its fiduciary duties under ERISA.

## EXCESSIVE INVESTMENT RELATED FEES

104.    LabCorp failed to prudently monitor and select proper share classes of thirteen (13) investments offered by the Plan. Investment companies offer pricing discounts to retirement plans. The discounts are offered mainly because investment companies recognize that trillions of dollars are invested through retirement plans and they want their investments to be offered by retirement plans, so they offer pricing discounts to retirement plans. The discounts are typically referenced

- 27 -

by what is known as "share classes." The "retail" share class of an investment charges a higher price than a "retirement plan" share class. But in all other material aspects, the underlying investment is the same. Here, LapCorp selected more expensive share classes than identical less expensive share classes of the same investments. Except for the extra fees, the share classes are/were identical. Plaintiff estimates that LabCorp's imprudent choices as to share classes resulted in more than $750,000.00 in excessive fees paid by the Plan and its participants.

105.    LabCorp recently discovered its error and replaced the more expensive share classes with the prudent, less expensive, but identical, share classes of the same investments. LabCorp's belated recognition that the inclusion of the more expensive share classes on its Plan's investment menu was, in fact, not prudent.

106.    Had LabCorp utilized a prudent process in place during the entirety of the Class Period, such a determination would have been made earlier, saving Plan participants approximately $750,000.00 in wasted retirement assets over the Class Period.

107.    A prudent fiduciary must conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options. A fiduciary's failure to select prudent investments or failure to remove an imprudent investment from a plan within a reasonable time, as LabCorp has done here, constitutes a breach of ERISA's fiduciary duties. *Hughes v. Nw. Univ.*, 211 L. Ed. 2d 558, 142 S. Ct. 737, 742 (2022).

108.    The time period from 2015 through October 4, 2022, during which LabCorp waited to remove the imprudent investments identified herein, specifically as to the T. Rowe Price Retirement 2005 through 2065 Trust Class E Target Date Funds, and the MFS Mid Cap Growth Fund Class R6 (OTCKX), is/was not a reasonable period of time. As such, LabCorp breached its fiduciary duty.

109.     Long before *Hughes*, the Supreme Court reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 575 U.S. 523. In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act ("UPIA"), treatises, and seminal decisions confirming the duty.

110.     The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets...." *Tibble*, 575 U.S. 523 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id.* § 2 comment.

111.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires the regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

112.     Adherence to these duties requires the regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

113.     As demonstrated by the chart below, in several instances during the Class Period, LabCorp failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost.

114.     Unlike a claim premised on an imprudent choice between two different mutual funds that perform differently over time, a claim premised on the selection of a more expensive class of the same fund **guarantees** worse returns.  *Forman v. TriHealth, Inc.*, 40 F.4th 443, 451 (6th Cir. 2022)

115.     The two share classes will produce the same initial returns, but higher costs will erode the retail shares' gains and steepen any losses. As costs compound, the differential will grow each year. Over the long haul, management fees, like taxes and inflation, are salient features of investment performance.

116.     During the Class Period, LabCorp failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's target date funds and mutual funds, that were/are identical to the funds in the Plan in every way except for their lower cost.

- 30 -

117. More specifically, as of October 4, 2022, the Plan's menu needlessly consisted of expensive target date and mutual fund share classes offered by the Plan during the Class Period when, in fact, lower-cost share classes for the same funds were readily available:

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| MFS Mid Cap Growth Fund Class R6 (OTCKX) | **.66%** | MFS Mid Cap Growth CIT Fee Class CT (no ticker) | **.57%** |
| T. Rowe Price Retirement 2005 Trust Class E | **.30%** | T. Rowe Price Retirement 2005 Trust Class J | **.27%** |
| T. Rowe Price Retirement 2010 Trust Class E | **.30%** | T. Rowe Price Retirement 2010 Trust Class J | **.27%** |
| T. Rowe Price Retirement 2015 Trust Class E | **.30%** | T. Rowe Price Retirement 2015 Trust Class J | **.27%** |
| T. Rowe Price Retirement 2020 Trust Class E | **.30%** | T. Rowe Price Retirement 2020 Trust Class J | **.27%** |
| T. Rowe Price Retirement 2025 Trust Class E | **.30%** | T. Rowe Price Retirement 2025 Trust Class J | **.27%** |
| T. Rowe Price Retirement 2030 Trust Class E | **.30%** | T. Rowe Price Retirement 2030 Trust Class J | **.27%** |
| T. Rowe Price Retirement 2035 Trust Class E | **.30%** | T. Rowe Price Retirement 2035 Trust Class J | **.27%** |
| T. Rowe Price Retirement 2040 Trust Class E | **.30%** | T. Rowe Price Retirement 2040 Trust Class J | **.27%** |
| T. Rowe Price Retirement 2045 Trust Class E | **.30%** | T. Rowe Price Retirement 2045 Trust Class J | **.27%** |
| T. Rowe Price Retirement 2050 Trust Class E | **.30%** | T. Rowe Price Retirement 2050 Trust Class J | **.27%** |
| T. Rowe Price Retirement 2055 Trust Class E | **.30%** | T. Rowe Price Retirement 2055 Trust Class J | **.27%** |

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| T. Rowe Price Retirement 2060 Trust Class E | **.30%** | T. Rowe Price Retirement 2060 Trust Class J | **.27%** |
| T. Rowe Price Retirement 2065 Trust Class E | **.30%** | T. Rowe Price Retirement 2065 Trust Class J | **.27%** |

118.    Plaintiff alleges that these fees are excessive, ***not*** by virtue of their percentage, but because there are different versions of the same investment vehicle available to the Plan with identical managers, investment styles, and funds, that have lesser fees.

119.    LabCorp waited until October 5, 2022, before finally switching to the lower cost "J" share class of the T. Rowe Price Retirement Target Date funds. By that time, however, a more expensive share class of the target date funds had been part of the investment menu lineup since at least 2015, causing the Plan and Plan participants to needlessly incur significant (but needless) fees.

120.    More specifically, from 2015-2017 LabCorp caused the Plan to invest in the "B" share class of the T. Rowe Price Target Date Funds which are also more expensive than the "J" class.  Then, from 2018-2020 LabCorp caused the Plan to invest in the "C" share class of the T. Rowe Price Target Date Funds, which are also more expensive than the "J" class. Considering that the Labcorp Plan had more than one billion dollars in assets from 2015 through today, the less expensive "J" class (or an equivalent) has always been available to the Plan.

121.    As the table above illustrates, throughout the Class Period LabCorp should have known of the existence and availability of lower-cost share classes and should have promptly transferred the Plan's investments in such funds to the least expensive share classes.  However,

LabCorp failed to do so in a prudent manner, instead waiting many years before making any changes.

122.    When it selected the above target date funds, and the MFS Mid Cap Growth Fund Class R6 (OTCKX), had LabCorp simply compared the gross/net expense ratios of the challenged funds to the gross/net expense ratios for the less expensive share class funds identified above, as any prudent fiduciary would, LabCorp would have instead selected the less expensive, but *identical share classes*, available to the Plan.

123.    The funds offered by the Plan were more expensive than the same funds available to the Plan — a claim nearly identical to one addressed by the Supreme Court recently in *Hughes*.

124.    Put more specifically, LabCorp used a flawed and imprudent fiduciary process when it added the T. Rowe Price Retirement Target Date Funds 2005 through 2065 Trust Class E funds to the Plan menu in 2020 by failing to select the identical fund for the Plan, but a share class priced for retirement plans which is a lower cost than the share class selected by LabCorp. The same is true as to the MFS Mid Cap Growth Fund Class R6 (OTCKX).

125.    LabCorp then acted imprudently by keeping the more expensive T. Rowe Price Target Date Funds 2005 through 2065 Trust Class E on the Plan investment menu from 2015 through October 5, 2022, when the less expensive "J" class was available, especially because both share classes had the same investment strategy, portfolio, and management teams. The imprudent process and decisions resulted in a significant waste of retirement savings for the Plan and its participants, including the Plaintiff and other Plan participants. LabCorp's fiduciary failure is massive as of the year ending 2020, there were nearly $2 billion of Plan participant retirement savings invested in the 13 funds at issue.

- 33 -

126.     Plan assets are being needlessly wasted and retirement savings frittered away. This is a classic breach of ERISA's fiduciary duty of prudence.

127.     A prudent fiduciary conducting an impartial review of the Plan's investments on a monthly, quarterly, or at least an annual basis, would have easily identified the prudent share classes available and transferred the Plan's investments in the above-referenced funds into lower-cost prudent shares at the earliest opportunity. Yet, despite the availability of lower-cost shares, LabCorp failed to do so, in breach of its fiduciary duties.

128.     There is no good-faith explanation for utilizing a high-cost share class when a lower-cost share class is available for the exact same investment. The Plan did not receive any additional services or benefits based on its selection of more expensive share classes; the only consequence was higher costs for Plan participants.

129.     Plaintiff is not arguing that LabCorp had a duty to scour the market to find and offer a cheaper investment. Instead, Plaintiff alleges simply that lower-cost investments with identical managers, investment styles, and stocks should have been considered by the Plan, particularly as it relates to the 14 funds identified above.

## FIRST CLAIM FOR RELIEF
### *Breach of Fiduciary Duty of Prudence*

130.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

131.     As a fiduciary of the Plan, LabCorp was and remains subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person

- 34 -

acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

132.    LabCorp breached these fiduciary duties in multiple respects as discussed throughout this Complaint. LabCorp failed to monitor or control the excessive compensation paid for recordkeeping services. Additionally, LabCorp did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and as to what was in the best interest of Plan participants as prudent fiduciary acting with the skill, diligence, and in a like capacity (administering $4 billion or retirement assets).

133.    Instead, LabCorp selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.

134.    LabCorp also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan and failed to act within a reasonable time to remove funds that should have been replaced with lower-cost share class funds.

135.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had LabCorp complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement

136.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), LabCorp is liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for LabCorp's breaches as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plan and all Plan participants, respectfully requests that the Court:

1. Find and declare that LabCorp breached its fiduciary duties as described above;

2. Find and adjudge that LabCorp is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3. Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4. Order LabCorp to provide all accountings necessary to determine the amounts LabCorp must make good to the Plan under §1109(a);

5. Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6. Surcharge against LabCorp and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7. Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

8. Certify the Class, appoint the Plaintiff as class representative, and appoint his counsel as Class Counsel;

9. Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10. Order the payment of interest to the extent it is allowed by law; and

11.     Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 11th day of November, 2022.

Respectfully submitted,

/s/ *Matthew Norris J.*
**MATTHEW NORRIS J.**
NC Bar No. 37206
**NORRIS LAW FIRM, PLLC**
1776 Heritage Center Drive, Suite 204
Wake Forest, NC 27687
Telephone: (919) 981-4475
Facsimile: (919) 926-1676
Email: matt@lemonlawnc.com

**BRANDON J. HILL** (*special appearance*)
Florida Bar Number: 37061
**LUIS A. CABASSA** (*special appearance*)
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK** (*special appearance*)
Florida Bar Number: 0285020
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Telephone: (813) 337-7992
Facsimile: (813) 229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

**MICHAEL C. MCKAY** (*special appearance*)
**MCKAY LAW, LLC**
Arizona Bar No. 023354
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mmckay@mckaylaw.us

- 37 -

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on this 11th day of November, 2022, the foregoing was electronically filed using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Matthew Norris J.*
**MATTHEW NORRIS J.**