# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| DAMIAN MCDONALD, on behalf of the Laboratory Corporation of America Holdings Employees' Retirement Plan, and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:22CV680 |
| LABORATORY CORPORATION OF AMERICA HOLDINGS, | ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, Senior District Judge.

Damian McDonald, ("Plaintiff McDonald"), on behalf of himself and all others similarly situated ("Plaintiffs") brought this class action against Defendant Laboratory Corporation of America Holdings ("LabCorp"). (ECF No. 15 ¶ 4.) Plaintiffs allege that LabCorp breached its fiduciary duty of prudence to the Laboratory Corporation of America Retirement Savings Plan, (the "Plan") in violation of the Employee Retirement Income Security Act ("ERISA"), under 29 U.S.C. § 1109(a)(2) and (3) to enforce liability under 29 U.S.C. § 109(a). (*Id.*) Plaintiffs specifically allege that LabCorp breached its duty of prudence by (1) failing to manage and control compensation paid to the Plan's recordkeeper; and (2) selecting imprudent investments for the Plan. (*Id.* ¶¶ 132-34.)

This matter came before the Court for a bench trial from May 5, 2025, through May 8, 2025. The Court has considered the evidence presented at trial and makes Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52. Fed. R. Civ. P. 52. For the reasons discussed below, the Court finds that Plaintiffs failed to meet their burden to establish that LabCorp breached its fiduciary duty of prudence and further finds that LabCorp engaged in a prudent process in managing its recordkeeping fees and monitoring the Plan's investment shares. Accordingly, the Court rules against Plaintiffs and in favor of Defendant on each of Plaintiffs claims.

## I. PROCEDURAL HISTORY

On August 18, 2022, Plaintiff McDonald initiated this action by filing a complaint. (ECF No. 1.) He then filed his First Amended Complaint ("Complaint") on November 14, 2022. (ECF No. 15.) As stated above, the Complaint alleges that LabCorp breached its fiduciary duty of prudence under ERISA in monitoring the Laboratory Corporation of America Retirement Savings Plan's (the "Plan") recordkeeping fees, and investments. (*Id.* ¶ 132.) With respect to the recordkeeping claim, Plaintiffs allege that LabCorp "failed to monitor or control the excessive compensation paid for recordkeeping services." (*Id.*) With respect to the share class claim, Plaintiffs allege that LabCorp "selected and retained investment options in the Plan despite the high cost of the funds," and "failed to investigate the availability of lower-cost share classes of certain mutual funds." (*Id.* ¶¶ 133, 134.) Based on these allegations, Plaintiffs allege that the Plan "suffered millions of dollars of losses." (*Id.* ¶ 135.)

At the motion to dismiss stage, this Court found that Plaintiffs failed to state a claim that LabCorp breached its duty of prudence by removing a mutual fund in favor of a Mid Cap Growth CIT; however, all of Plaintiffs' other claims were sufficiently pled. (ECF No. 24 at 16.) On October 16, 2024, this Court granted Plaintiffs' Motion for Class Certification and appointed Plaintiff McDonald as class representative. (ECF No. 50 at 16.) Following discovery, on November 24, 2024, LabCorp filed a Motion for Summary Judgment on all of Plaintiffs' claims, (ECF No. 52), and on the same day filed Motions to Exclude Experts Al Otto and Ty Minnich, (ECF Nos. 55, 57.)

The Court granted LabCorp's motion to exclude portions of Al Otto's opinions and denied LabCorp's motion to exclude Ty Minnich's opinions. (ECF No. 76 at 19.) The Court found that Al Otto's opinions on a reasonable recordkeeping fee and the amount of float compensation paid to the recordkeeper were unreliable. (*Id.* at 7, 9.) However, the Court found the opinions of expert Ty Minnich were reliable. (*Id.* at 11.) Regarding LabCorp's summary judgment motion, the Court found genuine issues of material fact for a reasonable factfinder to resolve. (*Id.* at 18.)

The parties filed pretrial disclosures, (ECF Nos. 79, 80, 81 82, 83), trial briefs, (ECF Nos. 91, 94), and motions in limine, (ECF Nos. 85, 87, 89). The Court held a Final Pretrial Conference on April 29, 2025. On May 1, 2025, the parties filed a joint stipulation of facts. (ECF No. 109.) Starting on May 5, 2025, the Court held a four-day bench trial in which the Court heard testimony from Al Otto ("Otto"), Ty Minnich ("Minnich"), Plaintiff McDonald, Robert Pringle ("Pringle"), Peter Wilkinson ("Wilkinson"), John Martin ("Martin"), Steven Gissiner ("Gissiner"), and Sam Guess through deposition testimony ("Guess"). Following

trial, the parties filed amended Proposed Findings of Fact and Conclusions of Law. (ECF Nos. 117, 118.)

## II. FINDINGS OF FACT

Based on the Court's review of the testimony presented at trial, the exhibits admitted into evidence, the parties' proposed findings of fact, and the parties' Joint Stipulation of Facts, the Court makes the following findings of fact:

### A. Factual Findings Regarding Expert Witnesses

In accordance with its Order, (ECF No. 76), this Court did not consider Otto's excluded opinions when it resolved LabCorp's Motion for Summary Judgment. (*See id.* at 9.) Plaintiffs did not challenge the opinion of LabCorp's retained expert, Steven K. Gissiner. Thus, both Minnich and Gissiner's expert opinions were considered in full in the resolution of LabCorp's Motion for Summary Judgment. (ECF No. 76 at 11, 15–18.) During the bench trial, the principal sources of evidence in Plaintiffs' case in chief were the testimonies of their two retained experts, Otto and Minnich. (ECF No. 113 at Tr. 44:16–253:25 (Otto)); (ECF Nos. 113, 114 at Tr. 254:23–388:4 (Minnich).) LabCorp presented the testimony of Gissiner during its case in chief. (ECF Nos. 115, 116 at Tr. 752:5–238:15 (Gissiner).)

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's decision *Daubert v. Merrell Dow Pharms, Inc.* 509 U.S. 579 (1993); In *re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. and Prods. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 631 (4th Cir. 2018). Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . (a) the expert's scientific, technical, or other specialized knowledge will help

4

the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d). Expert testimony is admissible only if: (1) the expert is qualified, (2) the testimony is relevant, and (3) the testimony is based on reliable scientific methodology. *See Daubert*, 509 U.S. at 594-95. The Court must find these elements "at the outset, . . . by a preponderance of proof." *Id.* at 592, 592 n. 10. The proponent of expert testimony must establish the admissibility of an expert's testimony. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

"To determine whether an opinion of an expert witness satisfies *Daubert* scrutiny, courts may not evaluate the expert witness' conclusion itself, but only the opinion's underlying methodology." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (citing *TFWS, Inc. v. Schaefer*, 325 F.3d 234, 240 (4th Cir. 2003)). Further, "questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility" of the witness' assessment, "not its admissibility." *Id.* (citing *Structural Polymer Grp. v. Zoltek Corp.*, 543 F.3d 987, 997 (8th Cir. 2008)) (internal quotation marks omitted). In a bench trial, "where the factfinder and the gatekeeper are the same, the court does not err in admitting evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006).

Thus, having already ruled on the admissibility of the testimony of Otto and Minnich, the Court will analyze the admissibility of Gissiner's trial testimony. In addition, the Court

will determine what weight, if any, the evidence presented by the parties' proffered experts will be given and to what extent this testimony is relevant for this Court's conclusions of law.

       1.   <u>The trial testimony of Al Otto has limited probative value and was not persuasive to this Court</u>

a.  Plaintiffs' expert, Otto, testified that he is a board-certified fiduciary and accredited investment fiduciary.  (ECF No. 113 at Tr. 45:18-21 (Otto).)

b.  Otto also holds a certificate in applied fiduciary practices and fiduciary leadership from Wake Forest University.  (*Id.* at Tr. 45:23-24 (Otto).)

c.  Otto additionally testified to having worked in the retirement industry as a fiduciary for approximately 25-30 years.  (*Id.* at Tr. 45:18-19 (Otto).)

d.  Otto has experience serving as an investment advisor, an investment manager and a named investment fiduciary in his career.  (*Id.* at Tr. 45:25–46:2 (Otto).)

e.  Otto testified to having formerly worked at an investment firm, Shepherd Kaplan Krochuk.  (*Id.* at Tr. 51:21-22 (Otto).)

f.  While at Shepherd Kaplan Krochuk, Otto worked with proprietary software to analyze retirement plans.  (*Id.* at Tr. 52:11-16 (Otto).)

g.  Otto testified that at Shepherd Kaplan Krochuk he was exposed to multiple retirement plans, some valued at over one billion dollars in assets.  (*Id.* at Tr. 52:21-24 (Otto).)

h.  For some of those retirement plans, Otto served as an investment advisor and in others he served as a named investment fiduciary.  (*Id.* at Tr. 52:25–53:2, 51:22 (Otto).)

i.  As a named fiduciary, Otto facilitated meetings with retirement plan committees to discuss their investments.  (*Id.* at Tr. 52:25–53:2 (Otto).)

j.   Following this Court's Order regarding his testimony, Otto was permitted to provide his expert opinion regarding the reasonableness of the Plan's recordkeeping fees and share classes.  (*Id.* at Tr. 181:9-14 (Otto).)

k.   Otto was also permitted to provide his expert opinion about the Plan Committee's process for evaluating the Plan's recordkeeping fees and share class selection.  (*Id.*)

l.   Otto testified about the definitions of industry terms and tools for evaluating retirement plans.  (*Id.* at Tr. 77:2-11, 97:23–98:7, 102:5–103:10, 105:10–106:1 (Otto).)

m.   Otto also offered his expert opinion on the reliability of industry tools to evaluate retirement plans, their investments, and their costs.  (*Id.* at Tr. 77:6-11, 82:13-14 (Otto).)

n.   To form his opinion, Otto testified to reviewing Plan documents, Plan Committee meeting minutes, the Plan's financial reporting, and the depositions of Plan Committee members: Pringle, Guess, and Wilkinson.  (*Id.* at Tr. 49:2-10 (Otto).)

o.   In addition to reviewing these documents, Otto testified to drawing on his personal professional experience to support the conclusions in his expert opinions.  (*See e.g., id.* at Tr. 132:14, 132:21-22 (Otto).)

p.   Relying on this evidence, Otto's testified that the only way to "actually determine" the market cost of recordkeeping services was to conduct Requests for Proposals ("RFPs").  (*Id.* at Tr. 65:10-13 (Otto).)

q.   Otto concluded that RFPs were the more effective way for the Plan Committee to negotiate for lower recordkeeping fees and to access more economical share classes.  (*Id.* at Tr. 132:7-16 (Otto).)

r. However, Otto also concluded that the Plan Committee, could call retirement plan providers and use the size of the Plan to negotiate for lower recordkeeping fees and to access more economical share classes, even when they did not qualify for them. (*Id.* at Tr. 151:9-18, 151:22-24, 133:5-7 (Otto).)

s. Because Otto could not find evidence that LabCorp conducted an RFP during the class period, (*Id.* at Tr. 72:14-17, 72:23-25 (Otto)), he concluded that LabCorp failed to access the most economical share classes and obtain the lowest recordkeeping fees. (*Id.* at Tr. 136:3-6 (Otto).)

t. However, Otto's conclusions often relied on *his* practice in his career, and he did not produce testimony to indicate that his practices mirrored standard industry practices. (*See e.g.*, *id.* at Tr. 132:7-16, 151:16-18, 151:22-24 (Otto).)

u. Moreover, Otto testified to relying on approximations, generalities, and personal examples rather than basing his conclusions on demonstrable data. (*See e.g.*, *id.*)

v. Further, when referencing other experts' use of publicly available data, including those maintained by investment firms in the retirement plan industry, Otto acknowledged that such data could be used and testified to using it in the past. (*Id.* at Tr. 69:10-16 (Otto).) Yet, Otto testified that he did not use that data for his own analysis in this case. (*See id.*)

w. Moreover, during his testimony, Otto presented only a passing familiarity with the evidence he reviewed to prepare his report and the figures he relied on to make his conclusions. (*See e.g.*, *id.* at Tr. 81:6-20, 85:3-12, 92:15-9, 101:3-6 (Otto),)

x. Accordingly, this Court finds that Otto's expert testimony, though admissible, has limited probative value. Therefore, this Court affords Otto's expert testimony little weight in the resolution of this dispute.

2.  The trial testimony of Ty Minnich has limited probative value and was not persuasive to this Court

a.  Plaintiffs' expert, Minnich, testified that he is a consultant who is a certified employee benefit specialist and retirement plan administrator. (ECF No. 113 at Tr. 256:18-19, 259:12-13 (Minnich).)

b.  Minnich testified that his certifications are from the Wharton School of Business, and he also received a bachelor's degree in mathematics from the University of Miami Florida. (*Id.* at Tr. 259:5, 259:12-13 (Minnich).)

c.  In addition, Minnich testified to spending his entire career in the retirement business, previously serving as a representative for recordkeepers, including MetLife and Transamerica. (*Id.* at Tr. 256:8-17 (Minnich).)

d.  While at Transamerica, Minnich testified that he responded to hundreds of requests for Proposals ("RFPs"), Requests for Information ("RFIs"), and benchmarking studies. (*Id.* at Tr. 257:19, 258:17-18, 258:24-25 (Minnich).)

e.  Minnich stated that his familiarity with LabCorp's Plan provider, Fidelity, and its service model, is based on his experience working for Fidelity's competitors. (*Id.* at Tr. 262:7-11 (Minnich).)

f. At trial, Minnich opined that he believed the Plan's recordkeeping fees paid to Fidelity were unreasonable relative to the services Fidelity provided. (*Id.* at Tr. 261:25–262:2 (Minnich).)

g. Minnich concluded that because LabCorp did not conduct an RFP, they could not ascertain the market value of Fidelity's recordkeeping services or negotiate to lower Fidelity's price of those services. (*See e.g.*, ECF No. 114 at Tr. 314:15-18 (Minnich).)

h. At trial, Minnich did not provide an overview of the materials he reviewed to form his expert opinions, but it appeared he relied on discovery materials. (*See e.g.*, *id.* at Tr. 314:21–22 (Minnich) ("to the best of my knowledge and all of the discovery documents, there was no RFP during the entire Class Period."), (*Id.* at Tr. 334:23-24 (Minnich)) ("I read all the discovery documents in the case.").

i. Minnich specifically testified to reviewing the benchmarking studies and RFIs conducted by CAPTRUST and the *Moitoso* stipulation.[1] (ECF No. 113 at Tr. 284:15–21 (Minnich).)

---

[1] Minnich also testified that he reviewed the Complaint, and the sample recordkeeping fees contained therein, but this was not disclosed in his expert report or in through the supplementation of his expert report. (ECF No. 113 at Tr. 265:7–12 (Minnich).) When Minnich testified to doing this, LabCorp objected, and Plaintiffs' counsel represented to the Court that Defendant was on notice that Minnich reviewed these materials, because he testified to doing so at his deposition. (*Id.* at Tr. 265:13–268:20 (Minnich).) However, upon this Court's review of Minnich's deposition, Plaintiffs' counsel misrepresented Minnich's testimony. Thus, because Minnich's expert conclusions about the recordkeeping fees listed in the Complaint were made for the first time at trial, they will not be considered by this Court.[2] Plaintiffs' counsel represented that Plaintiff McDonald received a "hardship release or a natural disaster waiver" that permitted him to take money out of his retirement plan. (ECF No. 116 at Tr. 891:18-23.) However, Plaintiff McDonald's account statements do not indicate that these loans are for natural disaster relief.

10

j. Minnich testified that based on reviewing this evidence, he concluded that a reasonable recordkeeping fee for the Plan would have been between $20 and $25 throughout the entire class period. (ECF No. 114 at Tr. 323:4-5 (Minnich).)

k. On cross examination, however, Minnich testified that his reasonable recordkeeping fee calculation was made by him first deciding what he believed would be a reasonable recordkeeping fee and then using evidence to confirm his initial calculation. (*Id.* at Tr. 370:4-13 (Minnich).)

l. Further, Minnich could not recall the details of the documents he testified to reviewing on direct examination to form his expert opinions, even when the document was in front of him to refresh his recollection. (*Id.* at Tr. 352:16–353:13 (Minnich).)

m. Minnich was also unable to correctly identify and define terms on the Plan's financial reporting forms, documents he stated he reviewed to prepare his opinion in this case. (*Id.* at Tr. 348:17–350:19 (Minnich).)

n. In addition, when LabCorp cross-examined Minnich with specific number values on the LabCorp financial reports, Minnich often could not explain them. (*See e.g.*, *id.* at Tr. 353:14–354:1 (Minnich).)

o. When asked why he could not explain these numbers, Minnich testified that the only explanation for those numbers was that they were "counterintuitive" and not "typical." (*Id.*)

p. Minnich also made sweeping statements about the price tendencies of recordkeeping fees, which were contradicted on cross examination. (*Id.* at Tr. 335:16–336:22 (Minnich).)

11

q. Accordingly, this Court finds that Minnich's expert testimony, though previously found by the Court to be admissible, has limited probative value. Therefore, this Court affords Minnich's expert testimony little weight in the resolution of this dispute.

3. <u>The trial testimony of Steven Gissiner was probative and persuasive to this Court</u>

a. Defendant's expert, Steven Gissiner, testified that he has worked in several parts of the retirement plan industry. (ECF No. 115 at Tr. 753:3-23 (Gissiner).)

b. Gissiner testified to obtaining his bachelor's degree from Muskegon University and his master's in business administration from the University of Akron. (*Id.* at Tr. 754:1-2 (Gissiner).)

c. Gissiner also testified that he served as a bank department trust officer, where he managed retirement plans and performed recordkeeping services. (*Id.* at Tr. 753:4-9 (Gissiner).)

d. Gissiner testified that he has worked as a retirement plan consultant at his own firm for seventeen years, again providing administrative recordkeeping services and other investment consulting services. (*Id.* at Tr. 753:21-23 (Gissiner).)

e. In addition, Gissiner testified that as a consultant he regularly provides expert witness services. (*Id.* at Tr. 754:10-14 (Gissiner).)

f. To formulate his opinion, Gissiner testified to reviewing Plan committee minutes, the Plan's financial reporting documents, Plan governance documents, industry data on recordkeeping and share classes, his database of financial reporting of retirement plans,

CAPTRUST's RFIs and benchmarking studies for the Plan committee, among many other things. (*Id.* at Tr. 758:17-24, 761:5-15 (Gissiner).)

g.  Gissiner testified that he was retained by LabCorp to provide expert opinion testimony about the methods and process the Plan committee used to monitor recordkeeping fees and share classes. (*Id.* at Tr. 756:18-21 (Gissiner).)

h.  In addition, Gissiner testified that he was retained to testify about the reasonableness of the Plan's process for assessing fees and share classes consistent with industry practices. (*Id.* at Tr. 756:22-24 (Gissiner).)

i.  Gissiner also evaluated whether the Plan's transition to lower cost share classes over the class period was done in a reasonable time frame and done consistent with industry practices. (*Id.* at Tr. 756:24–757:3 (Gissiner).)

j.  Gissiner concluded that the LabCorp Committee had a reasonable and appropriate process for monitoring recordkeeping fees that was consistent with industry standards. (*Id.* at Tr. 757:7-16 (Gissiner).)

k.  To come to this conclusion, Gissiner testified that he conducted an independent analysis, called a "stress test," to determine whether the Plan Committee's process for monitoring and lowering recordkeeping fees was reasonable. (*Id.* at Tr. 758:7-11 (Gissiner).)

l.  Gissiner testified that his stress test involved comparing the Plan Committee's results to available data on the recordkeeping fees paid by retirement plans comparable to the Plan. (*Id.* at Tr. 757:17-23 (Gissiner).)

m.  Although Gissiner relied on his professional experience to form his conclusions, (*see e.g., id.* at Tr. 769:8–771:6 (Gissiner)), unlike Otto and Minnich, he collected and reviewed

13

independent data to analyze the reasonableness of the recordkeeping fees. (*Id.* at Tr. 784:17-22 (Gissiner).)

n. Also, unlike Otto and Minnich's testimony, Gissiner adeptly and coherently explained relevant terminology for retirement plan financial reporting and spoke about reporting specific to the Plan. (*Id.* at Tr. 790:5–791:3 (Gissiner).)

o. Further, Gissiner discussed the flaws in the methodology of Plaintiffs' experts and was able to provide data and explanations of industry practice to confirm the identified analytical errors. (*See e.g.*, *id.* at Tr. 790:5–792:13 (Gissiner).)

p. Accordingly, this Court finds that Gissiner's testimony is a solid, admissible expert opinion, *See Daubert*, 509 U.S. at 594-95, and further, his testimony is probative for the facts at issue in the present case. This Court found Gissiner's testimony to be helpful and affords significant weight to his testimony in the resolution of this dispute.

### B. Factual Findings Regarding the Parties and the Plan

1. Plaintiff McDonald is a LabCorp employee and a participant in the Plan. (ECF No. 109 ¶ 5.)

2. Plaintiff McDonald has been a participant in the Plan since he began working at LabCorp approximately 12 years ago. (ECF No. 114 at Tr. 389:9-10; 391:12-13 (McDonald).)

3. Plaintiff McDonald invested 100% of his Plan assets into the 2045 and 2050 vintages of the T. Rowe Price Target Date Funds. (*Id.* at Tr. 391:18-22 (McDonald)); (ECF No. 109 ¶ 11.)

4. On March 30, 2017, and March 29, 2018, Plaintiff McDonald took out a "PD Loan" from his retirement account.[2] JX 57 at 9; JX 58 at 9.

5. LabCorp sponsors the Plan for its employees to invest a portion of their pre-tax wages for retirement. (ECF No. 109 ¶ 1.)

6. The Plan is a defined contribution Plan, meaning that participants direct their retirement savings into individual investment options available in the Plan. (*Id.* ¶ 2.)

7. The Plan is maintained pursuant to a written plan document. PX 1.

8. The Plan is eligible to LabCorp employees based in the United States. (ECF No. 114 at Tr. 420:6-7 (Pringle).) Aside from limited exceptions, all LabCorp employees are eligible to participate in the Plan immediately upon hire. (ECF No. 109 ¶ 3.)

9. The Plan is a jumbo plan because it is a retirement plan that has an excess of one billion dollars in assets. (ECF No. 115 at Tr. 664:12-15, 665:1 (Martin).)

10. The Court certified Plaintiff McDonald to represent a class of all persons who were participating in or beneficiaries of the Plan, at any time between November 8, 2016, and the present ("Class Period").[3] (ECF No. 50 at 4, 16.)

---

[2] Plaintiffs' counsel represented that Plaintiff McDonald received a "hardship release or a natural disaster waiver" that permitted him to take money out of his retirement plan. (ECF No. 116 at Tr. 891:18-23.) However, Plaintiff McDonald's account statements do not indicate that these loans are for natural disaster relief.

[3] During trial, LabCorp objected to Plaintiffs' expert, Otto, presenting evidence of damage calculations beyond 2022, as Plaintiffs' expert did not supplement his expert disclosures. (ECF No. 113 at Tr. 56:19–57:19.) The Court sustained the objection and found that because Plaintiffs failed to supplement expert disclosures, Otto was not permitted to testify to damage calculations beyond those stated in his report. (*Id.* at 113 at Tr. 61:8-16.) Therefore, although the Court set the class from 2016 to the present, the evidence presented throughout trial consisted of evidence from 2016 to 2022.

11. Throughout the Class Period, the number of participants and assets in the Plan generally increased. On March 31, 2017, the Plan had 40,489 participants and approximately $1.4 billion in assets. JX 11 at 2. On March 31, 2018, the Plan had 43,552 participants and approximately $1.6 billion in assets. JX 12 at 2. On March 31, 2019, the Plan had 43,613 participants and approximately $1.7 billion in assets. JX 13 at 2. On March 31, 2020, the Plan had 44,213 participants and approximately $1.6 billion in assets. JX 14 at 2. On March 31, 2021, the Plan had 61,590 participants and approximately $3.9 billion in assets. JX 15 at 2. On March 31, 2022, the Plan had 62,100 participants and approximately $4.1 billion in assets. JX 16 at 2.

12. The Plan is among the largest in the country. (ECF No. 113 at Tr. 133:8–9 (Otto)).

13. During the Class Period, the Plan contained different investment options for participants, including: the T. Rowe Price Target Date Funds, the Fidelity Contrafund Commingled Pool fund, and the Fidelity Managed Income Portfolio fund, among others. (ECF No. 109 ¶ 10.)

14. Throughout the Class Period LabCorp made matching contributions to the Plan. (ECF No. 115 at Tr. 420:14-16 (Pringle).)

C.    **Factual Findings Regarding the Committee's Composition**

15. To administer the Plan, LabCorp delegated duties and authority to the Investment Committee ("Committee"). DX 4 at 1; (ECF No. 109 ¶ 7.)

16. The Committee is governed by the Investment Committee Charter ("Charter"). DX 4 at 1.

17. According to the investment committee charter, LabCorp delegated its authority to

administer the Plan to the LabCorp Committee. DX 4 at 1.

18. The Charter outlines the purpose and responsibilities of the Committee, the makeup of the Committee, and how the Committee shall operate. DX 4 at 1, 2, 3.

19. The Charter states that the purpose of the Committee is to "provide oversight of the investments of the retirement plans of [LabCorp] and its subsidiaries." DX 4 at 1.

20. The Committee is made up of LabCorp officers from the human resources & employee benefits, finance, treasury, and legal departments. (ECF No. 114 at Tr. 418:13-19 (Pringle)); DX 4 at 1; (ECF No. 109 ¶ 7.)

21. During the Class Period, the Committee was composed of the following members:

a. **Robert Pringle:** Pringle was the Senior Vice President and Treasurer for LabCorp. (ECF No. 114 at Tr. 410:6-8 (Pringle).) Pringle served on the investment committee from late 2015 or early 2016 through first quarter of 2023. (*Id.* at Tr. 411:2-3, 9 (Pringle).) Pringle was appointed chairman of the Committee in 2018. (*Id.* at Tr. 413:7-8 (Pringle)); DX 35 at 1.

b. **Peter Wilkinson:** Wilkinson is the current Chief Accounting Officer at LabCorp. (ECF No. 115 at Tr. 573:21 (Wilkinson).) He has held that position since March of 2019, and became a member of the Committee around the same time. (*Id.* at Tr. 573:23, 574:10-12 (Wilkinson).) Wilkinson currently sits on the Committee. (*Id.* at Tr. 574:1 (Wilkinson).) Wilkinson is also a participant in the Plan. (*Id.* at Tr. 622:14-16 (Wilkinson).)

c. **Sam Guess:** Guess was the Head of Compensation and Benefits at LabCorp. Guess Dep. 9:4–5. Guess served on the Committee from 2020 to 2024. Guess Dep. 10:13–16.

d. **And the following committee members who did not testify during trial:** Ed Dodson, Sam Eberts, Glenn Eisenberg, Jeff Holland, Kim Shalewitz, Sandra Van der Vaart, Lisa Uthgenannt, Inna Teyf, and Andrea Smith. JX 37 at 1; JX 38 at 1.

22. During the Class Period, the Committee met either three or four times per year. (ECF No. 115 at Tr. 629:3-6 (Wilkinson).) The Committee met three times in 2017, 2018, and 2021, and four times in 2016, 2019, 2020, and 2022. (ECF No. 109 ¶ 8.) The Committee charter states that the committee is to meet at least twice per year. DX 4 at 2.

23. Committee members received training on fiduciary responsibilities close to the start of their tenure on the Committee. Guess Dep. 11:5–15; (ECF No. 115 at Tr. 577:25–578:6 (Wilkinson)). Members recall receiving training during committee meetings and outside of committee meetings. (ECF No. 114 at Tr. 483:2–7 (Pringle)); (ECF No. 115 at Tr. 578:15–18 (Wilkinson).)

24. In administering the Plan, LabCorp retained Fidelity Workplace Services, LLC ("Fidelity") to serve as the Plan's recordkeeper. Fidelity served as the Plan's recordkeeper from August 18, 2016, to the present. (ECF No. 109 ¶ 6.)

25. Throughout the Class Period, LabCorp retained CAPTRUST to assist the Committee in administering the Plan. (ECF No. 109 ¶ 9.)

18

### D. Factual Findings Regarding CAPTRUST

26. CAPTRUST is an investment advisor with over 3,000 institutional clients and over one trillion assets they manage. (ECF No. 115 at Tr. 662:25–663:5 (Martin).)

27. CAPTRUST regularly attended the committee meetings. (*Id.* at Tr. 674:11-13 (Martin).)

28. The CAPTRUST employee assigned as principal financial advisor to the Plan is John Martin. (*Id.* at Tr. 661:8-9 (Martin), 665:17-24 (Martin).)

29. Martin works with Plans ranging from a few million dollars to plans of over 1 billion. (*Id.* at Tr. 665:7-8 (Martin).) Martin has worked with the Plan since 2009. (*Id.* at Tr. 734:5 (Martin).)

30. Martin personally attended every Committee meeting. (*Id.* at Tr. 674:9-10 (Martin).)

31. CAPTRUST provides services to the Plan such as fee benchmarking, fee methodology, constructing investment policy statements, and making recommendations with respect to asset classes and investment options. (*Id.* at Tr. 666:4-13 (Martin).)

32. CAPTRUST was mainly responsible for training the committee members. (ECF No. 114 at Tr. 412:13-15 (Pringle).)

33. CAPTRUST serves as a 3(21) advisor to the Plan. (ECF No. 155 at Tr. 671:2-5, 677:8-10 (Martin).) A 3(21) advisor is a fiduciary relationship where the advisor provides objective conflict free advice to a retirement plan client. (*Id.* at Tr. 666:22–667:3 (Martin).) In a 3(21) relationship, it is the client's responsibility to make the final decision. (*Id.*)

34. CAPTRUST served as a 3(21) advisor to the Plan until 2018. (*Id.* at Tr. 670:25–671:1 (Martin).)

35. Regarding recordkeeping fees, CAPTRUST is responsible for advising LabCorp of the fees being paid to the recordkeeper, what services are included, and advising LabCorp on whether the fees were reasonable.  (*Id.* at Tr. 671:12-16 (Martin).)

36. Following Committee meetings, CAPTRUST was in charge of preparing meeting minutes.  (*Id.* at Tr. 675:20–676:5 (Martin).)  After preparing the minutes CAPTRUST would send the minutes to LabCorp to review and offer any edits.  (*Id.*)  CAPTRUST received approval of the meeting minutes after the Committee reviewed the final version at the subsequent meeting.  (*Id.*)

37. Prior to Committee meetings, CAPTRUST circulated any pertinent documents to the Committee.  (*Id.* at Tr. 678:15-18 (Martin).)

38. CAPTRUST has different levels of analyses to assess recordkeeping fees.  (*Id.* at Tr. 687:7-8 (Martin).)  These include a benchmarking study, an RFI, and an RFP.  (*Id.*)

39. When conducing an RFI, CAPTRUST's vendor analysis team takes the information of the Plan and submits it to three to six providers that can service jumbo plans and asks them to "bid on the plan."  (*Id.* at Tr. 687:14–688:1 (Martin).)

40. When conducting an internal benchmarking study, CAPTRUST compiles their list of previous RFI's from clients of a similar size and uses their internal database to see how plans are priced.  (*Id.* at Tr. 688:12–689:5 (Martin).)

41. CAPTRUST recommends that their clients undergo a fee benchmark study or an RFI every three years.  (*Id.* at Tr. 690:5-7 (Martin).)

42. CAPTRUST did not recommend that the Committee conduct an RFP during the Class Period.  (*Id.* at Tr. 691:2-4 (Martin).)

20

### E. Factual Findings Regarding the Recordkeeper and Recordkeeping Services

43. As the Plan's recordkeeper, Fidelity was responsible for providing recordkeeping and administrative services to the Plan and its participants. (ECF No. 114 at Tr. 421:23–25 (Pringle)).

44. LabCorp Committee maintained sole fiduciary responsibilities for monitoring the recordkeeping fees Fidelity charged for its services to the Plan. (*See* ECF No. 115 at Tr. 671:12-16 (Martin).)

45. However, LabCorp retained CAPTRUST to serve as an investment advisor to assist in monitoring and advising on the Plan's recordkeeping expenses. (*Id.* at Tr. 518:7-8 (Pringle).)

46. Recordkeeping encompasses a variety of responsibilities, including maintaining a participant's payroll file, uploading it to their systems, editing the payroll file, processing loans, and other transactions the participant requests from their retirement assets. (*Id.* at Tr. 768:9-769:2 (Gissiner).)

47. Relevant to the dispute are two kinds of recordkeeping arrangements, "open architecture" and "proprietary fund" agreements. (*Id.* at Tr. 771:15, 771:24 (Gissiner).)

48. "Open architecture" recordkeeping agreements allow a retirement plan to select its investments from any investment provider, which may or may not include the recordkeeper. (*See id.* at Tr. 771:15-17 (Gissiner).)

49. "Proprietary Fund" recordkeeping arrangements require the retirement plan to select the recordkeeper's own investments as part of the plan's investment menu. (*Id.* at Tr. 693:2-4 (Martin).)

50. Around 2019, the LabCorp Plan maintained an "open architecture" recordkeeping arrangement with Fidelity. (*Id.* at Tr. 774:14-20 (Gissiner)); JX 1 at 1; JX 2 at 1.

51. Recordkeeping fees are generally "directly" paid for in two ways, the "fixed-fee model" and a "bundled model." (ECF No. 115 at Tr. 684:19-21, 685:6-16 (Martin).)

52. Under a "fixed model," the Plan pays a fixed amount to the recordkeeper per participant as compensation for the recordkeeper's services. (*Id.* at Tr. 684:19-21 (Martin).)

53. Under an "bundled model" the recordkeeper, by agreement, collects a certain percentage of the retirement plan's assets in compensation for the recordkeeper's services. (*Id.* at Tr. 685:6-16 (Martin).) This percentage can change based on the performance of the retirement plan's assets in the market. (*Id.*)

54. The LabCorp Plan maintained a "bundled model" with Fidelity until 2018 when the Plan switched to a "fixed-fee model" with Fidelity. JX 1 at 1; JX 2 at 1; (*Id.* at Tr. 686:6-16 (Martin).) Under that arrangement, from January 2015 until June 2018, the Plan paid $30 per Plan participant for recordkeeping services. JX 1 at 1. From July 2018 to June 2023, the Plan paid a fixed fee of $32 per participant in direct compensation to Fidelity. JX 2 at 1. From July 2023 to the present, the Plan paid a fixed fee $29 dollars per participant for recordkeeping services. JX 3 at 1.

55. Further, a recordkeeper, by agreement, may also collect additional compensation, "indirectly" as compensation for their services, these additional monies are not collected from the retirement plan's assets or the plan participants. ECF No. 114 at Tr. 422:18-23 (Pringle).)

56. During the class period Fidelity collected compensation "indirectly" through two mechanisms: "revenue sharing" and "float." (ECF No. 115 at Tr. 831:16-20 (Gissiner)); (ECF No. 114 at Tr. 422:18-23 (Pringle).)

57. "Revenue sharing" refers to the compensation investment managers earn by rebating a portion of the fees for their investment management services to the retirement plan provider. (ECF No. 114 at Tr. 423:5-8 (Pringle).)

58. "Float" refers to payments made to the recordkeeper based on the interest earned on investments that are kept in the recordkeeper's cash account before they are invested in funds. (*See id.* at Tr. 423:11-16 (Pringle).)

59. Prior to June 2018, LabCorp had an agreement with Fidelity that allowed them to collect compensation "indirectly" through both "revenue sharing" and "float." (*Id.* at Tr. 423:21–424:6 (Pringle).)

60. In 2016, Fidelity retained $67,064 in revenue sharing and $1,799 in float through indirect recordkeeping compensation. JX 30 at 2. In 2017, Fidelity retained $85,283 in revenue sharing and $19,542 in float. JX 31 at 2. In 2018, Fidelity retained $18,722 in revenue sharing and $57,080 in float. JX 32 at 2.

61. Following June 2018, any monies that would have been collected by Fidelity through revenue sharing and float was rebated back to Plan participants. (ECF No. 114 at Tr. 423:21-424:6 (Pringle).)

### F. Factual Findings Regarding the Investment Options and Share Classes

62. "Share class" is the terminology used to refer to the different types of traded funds that investment managers offer to investors. (*Id.* at Tr. 424:11-19 (Pringle)); (ECF No. 115 at Tr. 593:14-20 (Wilkinson).)

63. Importantly share classes differ in the price that investors pay. (*See* ECF No. 114 at Tr. 424:24–425:1 (Pringle).)

64. When a retirement plan invests in a certain fund, the share class determines the fees, also known as the "expense ratio," that are paid to be invested in that fund. (ECF No. 115 at Tr. 593:14-20 (Wilkinson).)

65. In general, to access certain "share classes" for a fund, a retirement plan must invest a minimum amount of its assets in that fund. (*Id.* at Tr. 650:23–651:1 (Martin).) Thus, as the Plan assets are invested in a share class the "expense ratio" is lowered as the Plan accesses a lower share class. (*Id.* at Tr. 593:17-20 (Wilkinson).)

66. On some occasions an investment manager will allow a retirement plan to access a lower share class than what they qualify for based on their stated minimum asset requirements. (*Id.* at Tr. 741:21-24 (Martin).)

67. There were three funds and their respective "share classes" that were relevant in this case: the T. Rowe Price Target Date Funds, the Fidelity Managed Income Portfolio Fund, and the Fidelity Contrafund Comingled Pool. (*Id.* at Tr. 757:23–758:1 (Gissiner).)

68. From 2016 until March 31, 2018, the Plan was invested in the second most expensive share class of the T. Rowe Price Target Date Fund, the B Class. JX 30 at 3; JX 31 at 2. The

next lowest share class for this fund, the C Class, had a minimum asset requirement of $1 billion. JX 55 at 11.

69. In November 2017, the T. Rowe Price Target Date Funds became the default for any Plan participant who did not select individual investments for their individual Plan account, which increased the amount of Plan assets that were invested in these funds. (ECF No. 114 at Tr. 453:17-23, 454:10-11 (Martin).)

70. Consequently, the assets in the T. Rowe Price Target Date Funds increased such that the Plan was able to access the lower C "share class." DX 35 at 2; JX 18 at 3; (*see also id.* at Tr. 470:11-21 (Pringle).) The expense ratio difference between the B and C share class was 2%. JX 55 at 11; *see also* DX 35 at 2.

71. In May 2021, CAPTRUST pursued negotiations with T. Rowe Price, and were able to secure access to the lower "E" share class for the T. Rowe Price Target Date Funds. JX 46 at 3; (*see also* ECF No. 115 at Tr. 747:25–748:7 (Martin).) The Plan did not meet the minimum asset requirements for this share class, which was $3 billion. JX 55 at 11.

72. In February 2022, CAPTRUST pursued negotiations with T. Rowe Price, and were able to secure access to the lowest "J" share class for the T. Rowe Price Target Date Funds. JX 47 at 2. The Plan did not meet the minimum asset requirements for this share class, which was $7.5 billion. JX 54 at 13.

73. From 2016 until March 2019, the Plan was invested in the second highest share class of the Fidelity Managed Income Portfolio Fund. *See* DX 37 at 4. CAPTRUST negotiated on LabCorp's behalf to join the next lowest share class, Class 3, beginning in March 2019. JX 13

at 3; *see also id.* Despite joining the Class 3 share class the Plan did not meet its minimum asset requirements until the end of 2020. *See* DX 51.

74. The Plan remains in Class 3 for the Fidelity Managed Income Portfolio Fund. *See id.*

75. From 2016 until March 2021, the Plan was invested in the highest share class of the Fidelity Contrafund Comingled Pool. *See* JX 21 at 3.

76. The next lowest "share class," Class 2, had a minimum asset requirement of $500 million. (ECF No. 115 at Tr. 795:21–22 (Gissiner)). The Plan met this asset minimum by December of 2020. *See* JX 45 at 3; (*see also id.* at Tr. 722:25–723:6 (Martin).)

77. In February 2021, CAPTRUST informed LabCorp that it would join Class 2 following it meeting this minimum asset requirement at the end of 2020. JX 45 at 3.

78. The Plan remains in Class 2 for the Fidelity Contrafund Comingled Pool. *See* DX 43.

## G. Factual Findings Regarding the Committee's Process

79. The Committee meeting minutes reflect discussion of recordkeeping fees at numerous meetings. *See e.g.*, JX 37 at 3; JX 39 at 4; JX 40 at 4; JX 43 at 4.

80. During the Class Period, the Committee reported no issues with the service Fidelity was providing to the Plan. (ECF No. 115 at Tr. 631:20-25 (Wilkinson).)

### 1. 2017 RFI

81. In 2016, as reflected in meeting minutes, the Committee directed CAPTRUST to provide a fee benchmark analysis for the Plan. JX 37 at 3.

82. In April 2017 CAPTRUST conducted an RFI for the Plan. (ECF No. 115 at Tr. 691:14-23 (Martin).)

83. In conducting this RFI, CAPTRUST solicited "bids" from four providers: Empower, Prudential, T. Rowe Price, and Vanguard. JX 50 at 5.

84. CAPTRUST set client specific screening criteria and CAPTRUST specific screening criteria. *Id.* One client specific screening criterion was that the Plan wanted no or low proprietary fund requirements. *Id.*

85. In response to the RFI, each of the four providers submitted an open architecture pricing model and a proprietary pricing model. JX 50 at 8–11. CAPTRUST compared the Plan's current $33 fee with Fidelity to the four proposals. *Id.*

86. Under both the open architecture model and the proprietary pricing model, the Plan's $33 fee per participant was lower than Empower, T. Rowe Price, and Vanguard, but higher than Prudential. *Id.*

87. As reflected in the meeting minutes, the Committee discussed the results of the RFI on May 23, 2017. JX 38 at 3. Following this meeting the Committee directed CAPTRUST to contact Fidelity to gain a better understanding of their pricing and to potentially negotiate a lower fee. *Id.* at 4.

88. On August 22, 2017, CAPTRUST informed the Committee that Fidelity offered to lower the recordkeeping fee to $25 per participant if the Plan added Fidelity's Proprietary Target Date Fund to the investment lineup, or to lower the recordkeeping fee to $32 if the Plan added a non-Fidelity Target Date Fund to the investment lineup. JX 39 at 4.

89. The Committee ultimately selected a non-Fidelity target date fund and determined that the Plan would pay Fidelity a fixed pricing model. JX 40 at 4.

### 2. 2019 RFI

90. On August 27, 2019, CAPTRUST recommended that they conduct another benchmarking study due to the growth of assets in the Plan. JX 42 at 4.

91. In November 2019 CAPTRUST conducted an RFI. JX 51 at 1.

92. In conducting this RFI, CAPTRUST solicited proposals from six providers: Prudential, Empower, Voya, T. Rowe Price, Principal, and Vanguard. JX 51 at 7–13.

93. In response to the RFI, each of the six providers submitted an open architecture pricing model and a proprietary pricing model. *Id.* CAPTRUST compared the Plan's current $32 fee with Fidelity to the six proposals. *Id.*

94. Under the open architecture pricing model, the Plan's fee was lower than T. Rowe Price, Principal, and Vanguard, but higher than Prudential, Empower, and Voya. *Id.* Under the proprietary pricing model, the Plan's fee was lower than Principal and Vanguard, higher than Prudential and Empower, but equal to T. Rowe Price. *Id.*

95. Based on the results of the study, CAPTRUST concluded that Fidelity's current fees are within the current benchmark range. JX 51 at 22.

96. On November 19, 2019, the Committee discussed the results of the 2019 RFI. JX 43 at 4. The committee determined that they were satisfied with Fidelity's recordkeeping services and fees. *Id.*

### 3. 2021 Benchmark Study

97. On November 16, 2020, the Committee directed CAPTRUST to conduct a fee benchmarking analysis due to the Plan's growth in assets from the Covance 401(k) Savings Plan consolidating with the LabCorp Plan. JX 44 at 3.

28

98. In January 2021 CAPTRUST conducted an internal benchmarking study. JX 52 at 1.

99. CAPTRUST selected four similarly sized plans from its proprietary database and compared those plans recordkeeping fees to the Plan. JX 52 at 10. In this study, CAPTRUST expressed the fees as a percentage of total plan assets to the plan's fees. *Id.* The Plan's fee was calculated as .05% of assets. *Id.*

100. The four comparator plans received proposals for recordkeeping services of .05% to .11%. *Id.* at 10, 11.

101. Based on the study, CAPTRUST concluded that the Plan's fees were within a reasonable benchmark range. *Id.* at 11.

### 4.    2022 Benchmarking Study

102. On November 15, 2022, the Committee directed CAPTRUST to conduct another benchmarking analysis. JX 48 at 4.

103. In November 2022, CAPTRUST conducted an internal benchmarking study. JX 53 at 1.

104. CAPTRUST selected four similarly sized plans from its proprietary database and compared those plans recordkeeping fees to the Plan. JX 53 at 10.

105. The study showed that the four comparator plans paid fees ranging from $19 to $58. *Id.* The Plan's current recordkeeping fee of $32 fell within the range of recordkeeping fees paid by the comparator plans. *Id.*

106. On February 15, 2023, the Committee and CAPTRUST discussed the results of the benchmarking study. JX 49 at 4–5.

107.     CAPTRUST informed the Committee that while the current recordkeeping fee fell within the benchmarking range, the fee was on the higher end of the range. *Id.* at 4. CAPTRUST further informed the Committee that the proprietary investment should serve as a basis for negotiating a lower recordkeeping fee. *Id.* at 5.

108.     The Committee directed CAPTRUST to negotiate a lower recordkeeping fee with Fidelity. *Id.* at 6.

109.     CAPTRUST followed up with Fidelity to negotiate a lower recordkeeping fee. JX. 49 at 6.

110.     Effective July 1, 2023, the Plan paid $29 per participant to Fidelity for recordkeeping. JX. 3 at 1.

## III.   CONCLUSIONS OF LAW

### A.     Plaintiffs Have Demonstrated Standing to Sue

The "persons empowered to bring a civil action" under ERISA are participants in an ERISA-covered retirement plan, plan beneficiaries, fiduciaries of a plan, and the Secretary of Labor. 29 U.S.C. § 1132(a). An ERISA plan participant includes "any employee . . . of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer." 29 U.S.C. § 1002(7). Plaintiffs are all participants in the LabCorp Plan from November 8, 2016, and the present (ECF No. 50 at 4, 16), and thus have standing to sue under ERISA. *Id.*

### B.     This Court has Jurisdiction Over This Matter

Plaintiffs brought this action under §§ 502(a)(3) and 515 of ERISA, codified at 29 U.S.C. § 1132(a)(2) and (3). (*See* ECF No. 1 ¶ 13.) Per § 502(e) of the ERISA statute, this

Court has exclusive jurisdiction over actions brought pursuant to §§ 502(a)(3) and 515. *See id.* § 1132(e)(1). Accordingly, this Court has subject matter jurisdiction over this dispute under this Court's federal question jurisdiction. 28 U.S.C. § 1331.

### C. LabCorp and CAPTRUST are Plan Fiduciaries Under ERISA

Prior to the bench trial, LabCorp notified Plaintiffs in their final pre-trial disclosures that they wished to enter into evidence three documents that purported to represent the relationship between LabCorp and the investment advisory company, CAPTRUST. (ECF No. 85 at 1–2.) As stated in this Court's Order on the parties' motion's in limine, these three documents are contractual agreements delineating the services that CAPTRUST provided to LabCorp's 401(k) Plan. (ECF No. 110 at 2 (citing ECF No. 99 at 5).) Plaintiffs filed a motion *in limine* asking this Court to exclude three "untimely CAPTRUST documents" pursuant to Federal Rules of Civil Procedure 26(e) and 37(c)(1) because plaintiffs argued they were produced to Plaintiffs for the first time on March 17, 2025. (ECF No. 85 at 1.) In response, LabCorp stated that the CAPTRUST documents were discovered on March 10, 2025, and that they were "inadvertently not produced" and were sent to Plaintiff seven days after LabCorp made this realization. (ECF No. 99 at 5.) Defendant argued that the three CAPTRUST documents should be admitted because they "simply memorialize what other uncontroverted evidence and sworn testimony established during the discovery period." (*Id.* at 2.) However, Defendant also argued that there would be no "benefit or disadvantage [to] either party," should the Court exclude this evidence, because "CAPTRUST's role and responsibilities were already clearly established and known to the litigants." (*Id.* at 18.)

After considering the arguments of the parties, this Court granted in part and denied in part Plaintiffs' motion in limine to exclude the three CAPTRUST documents, finding that LabCorp's prior untimely disclosure of them was "neither harmless nor substantially justified" under the applicable legal standard. (ECF No. 110 at 7, 7–8.) This Court also held the following:

> Defendant shall not be allowed to use the contested documents in the presentation of its case for any purpose and shall instruct its witnesses that they shall not testify about or otherwise make reference to said documents during their testimony at trial. However, the Court will allow Plaintiff to use the documents on cross examination for impeachment, to the extent a witness says something contrary to the contents of the documents.

(*Id.* at 7–8.) This Court's decision reflected its understanding that Plaintiffs would be prejudiced by the inclusion of these CAPTRUST documents at this late stage, but their veracity and their contents were undisputed. (*See id.*) Further, it was this Court's understanding that Plaintiffs' concern was that if the untimely CAPTRUST documents were admitted into evidence, that LabCorp would be able to off-load Plaintiffs' alleged violations of LabCorp's duty of prudence onto CAPTRUST. Accordingly, this Court sought to ensure that if LabCorp attempted at trial to offer evidence contrary to CAPTRUST's role, Plaintiffs would be able to use these documents to clarify the record.

However, from the beginning of trial, Plaintiffs' theory of the case seemed to be that it was CAPTRUST, not LabCorp, that was performing the duties of a prudent fiduciary, and that LabCorp inappropriately relied on CAPTRUST by allowing them to make recommendations to the Plan Committee and act on the Committee's behalf. (*See, e.g.*, ECF No. 113 at Tr. 22:9-12) ("[Y]ou're going to hear evidence that that blind reliance on

32

CAPTRUST, who was not a fiduciary of this plan, was part of the massive fiduciary failures that caused the Plan to lose money.). Indeed, it was Plaintiffs who invoked CAPTRUST, submitting evidence about CAPTRUST's role, and even going so far as to submit evidence about the adequacy of CAPTRUST's services to LabCorp's Committee and the Plan. Consequently, CAPTRUST, became an important part of Plaintiffs' arguments about how and whether LabCorp breached its fiduciary duties.

Yet, Plaintiff repeatedly represented to this Court that CAPTRUST was *not* a plan fiduciary. (*See, e.g.*, ECF No. 113 at Tr. 22:13-15) ("It's not enough under the law to hire an investment consultant and hand the reins—the fiduciary reins to an investment consultant who's not a fiduciary. You're going to hear evidence that's what happened here); ( ECF No. 115 at Tr. 735:14-16) ("[Y]ou would agree with me that . . . CAPTRUST was not a fiduciary for this plan with respect to recordkeeping services; correct?"). During trial, one of Plaintiffs witnesses, Otto, and Plaintiffs' counsel himself, stated on the record, that there were no writings to reflect that CAPTRUST was ever a 3(38) investment manager for the Plan or a fiduciary. (ECF No. 113 at Tr. 233:14–234:2 (Otto).) In response to LabCorp's objection, this Court was compelled to allow LabCorp witnesses to testify to the existence of the investment advisory contracts between LabCorp and CAPTRUST. (ECF No. 114 at Tr. 399:6-19.) Therefore, because of Plaintiffs' representations at trial, the Court must make conclusions about LabCorp and CAPTRUST's fiduciary status for the Plan.

"Fiduciary status under ERISA 'is not an all-or-nothing concept.'" *Reetz v Aon Hewitt Inv. Consulting, Inc.*, 74 F.4th 171, 179 (4th Cir. 2023) (quoting *Darcangelo v. Verizon Commc'ns, Inc.*, 292 F.3d 181, 192 (4th Cir. 2002)). "A person may be a fiduciary for some purposes but

not others." *Id.* (citing *Pegram v. Herdrich*, 530 U.S. 211, 225–26 (2000); *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007)). Indeed, even ERISA's terms outline the responsibilities of both formal and informal fiduciaries. *Dawson-Murdock v. Nat'l Counseling Grp., Inc.*, 931 F.3d 269, 275, 276 (4th Cir. 2019) (citing *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 357 n.6 (4th Cir 2023); 29 U.S.C. §§ 1102(a)(2), 1002(21)(A)). Those who are named as fiduciaries in plan documents are known as "named fiduciaries." *Id.* at 275 (citing 29 U.S.C. § 1102(a)(2)). Each ERISA-covered plan is required by statute to "provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).

ERISA also recognizes what the Fourth Circuit has termed a "functional fiduciary." *Dawson-Murdock*, 931 F.3d at 276 (quoting *Tatum*, 761 F.3d at 357 n.6). This term encompasses those who, while not named in plan documents, "*de facto* perform[] specified discretionary functions with respect to the management, assets, or administration of the plan." *Dawson-Murdock*, 931 F.3d at 276 (quoting *Custer v. Sweeney*, 89 F.3d 1156, 1161 (4th Cir. 1996) (alterations omitted in original) (internal quotation marks omitted); 29 U.S.C. § 1002(21)(A) (defining functional fiduciaries). Sometimes, an investment company is retained to be an "investment advisor" for an ERISA-covered plan. These investment advisors are functional fiduciaries per the terms of 29 U.S.C. § 1002(21)(A), which is why they are also known as "3(21) fiduciaries." A 3(21) fiduciary is retained to provide advice regarding a retirement plan's investments and its management; however, the named fiduciary maintains its authority to make final decisions regarding the plan. 29 U.S.C. § 1002(21)(A).

34

CAPTRUST served as a 3(21) investment advisor for the Plan throughout the class period. (ECF No. 114 at Tr. 425:18–426:15 (Pringle).) In this role, CAPTRUST provided fiduciary advice and recommendations to LabCorp regarding the Plan's investments and fees, but the LabCorp Committee retained the final decision-making authority and responsibility with regards to the Plan. (ECF No. 115 at Tr. 666:17–667:3 (Martin), 822:10–15 (Gissiner), 822:23–823:1 (Gissiner).) This is not subject to dispute.

In addition, ERISA permits investment managers to be appointed to assist fiduciaries in their administration of retirement plans. Investment managers are defined by the terms of 29 U.S.C. § 1002(38), and they are also known as "3(38) investment managers." A "3(38) investment manager" is a fiduciary other than a trustee or named fiduciary who has the power to manage, acquire, or dispose of any asset of a plan. *Id.* § 1002(38)(A). A 3(38) investment manager must also be properly registered under federal and/or state law. *Id.* § 1002(38)(B). Finally, a 3(38) investment manager's status as a plan fiduciary must be acknowledged in a writing. *Id.* § 1002(38)(C).

As stated above, CAPTRUST served as a 3(38) investment manager for the Plan from August 1, 2018, through the end of the class period. JX 41 at 1. In this role, CAPTRUST was retained to make investment decisions on behalf of the Committee and monitor Plan investments. However, CAPTRUST was not delegated fiduciary authority to make decisions about the Plan's recordkeeping fees, nor were they asked to monitor those fees. Instead, CAPTRUST continued to only make suggestions about recordkeeping fees as a 3(21) investment advisor. (ECF Nos. 114 at Tr. 426:16-24 (Pringle), 433:14-21 (Pringle); 115 at 623:1–624:1 (Wilkinson), 667:8–668:7 (Martin).) This also is not subject disputed.

35

However, at trial, Plaintiffs attempted to argue that because this Court in pre-trial excluded the three CAPTRUST documents mentioned above—including the "writing" that outlined the fiduciary responsibilities LabCorp delegated to CAPTRUST as a 3(38) investment manager—there can be no finding that these documents exist. In addition, according to Plaintiffs, if a 3(38) investment manager's status is not acknowledged in a writing, and that writing is not in evidence, there can be no finding that CAPTRUST had fiduciary duties delegated to it by LabCorp. (ECF No. 114 at Tr. 400:4-8.) Thus, during its presentation of evidence, Plaintiffs argued that this Court must find that the LabCorp Plan Committee retained exclusive fiduciary responsibilities over the Plan's investments and costs. (*See, e.g.*, ECF No. 113 at Tr. 233:11-21 (Otto)); (*see also* ECF No. 114 at Tr. 399:6–400:8, 400:16–411:11.) The Court declines to do so.

As a matter of trial procedure, this Court is aware of and does not condone Plaintiffs' conduct regarding the CAPTRUST evidence in this trial. It is not proper for Plaintiffs to ask this Court to bar Defendants from submitting evidence at trial only to subsequently submit evidence on the same topic. In addition, because of this Court's ruling on Plaintiffs' motion *in limine*, LabCorp's hands were tied regarding what evidence they could submit to contest Plaintiffs' allegations about LabCorp's alleged overreliance on CAPTRUST and its investment advice. According to the Court's Order, Plaintiff was the only party with power to use the documents "on cross examination for impeachment" evidence.[4] (ECF No. 110 at 8.)

---

[4] During the trial proceedings, Plaintiffs exceeded the bounds of this Court's Order and began to ask its witnesses whether these documents existed, and elicited testimony that suggested that the documents did not exist because they were not produced for Plaintiffs or for the review of Plaintiffs'

Nevertheless, even if there were a writing in evidence to reflect the nature of CAPTRUST's responsibilities as a 3(38) investment manager to the Plan, it is not necessary for this Courts analysis of Plaintiffs' ERISA claims. CAPTRUST and LabCorp *both* retain fiduciary duties, regardless of whether CAPTRUST is acting as a 3(38) investment manager or a 3(21) investment advisor. The LabCorp Plan Committee is the named fiduciary of the Plan, who, in this Circuit, always retains fiduciary responsibilities under ERISA. *See Dawson-Murdock*, 931 F.3d at 275. Although the ERISA statute allows fiduciary duties to be delegated to 3(38) investment managers, that delegation does not shield named fiduciaries from their duty of prudence.

Thus, while this Court, does not have the CAPTRUST contracts in evidence, it does not need the contracts to make conclusions about whether *LabCorp* breached its duty of prudence. *See e.g.*, *Meyer v. Berkshire Life Ins. Co.*, 250 F.Supp.2d 544, 575 (D. Md. 2003). Therefore, LabCorp, as the named fiduciary to the Plan, is the only subject of the Court's breach of the duty of prudence analysis.

**D. Plaintiffs Fails to Prove LabCorp Breached its Duty of Prudence in Managing the Plan**

1. Applicable Law for a Breach of Fiduciary Duty Claim

Under ERISA, the duty of prudence is defined as requiring a fiduciary to "discharge [their] duties with respect to a [retirement] plan solely in the interest of the participants and

---

witnesses. (ECF No. 113 at Tr. 233:11–234:17.) This is, of course, false; these documents do exist, and this Court was aware of their existence. Following this testimony, LabCorp asked for the opportunity to clarify this contradiction in the record so that their witnesses could testify to the documents' existence. (ECF No. 114 at Tr. 399:6-17.) This Court held then, and holds now, that Plaintiffs opened the door to this testimony. (*Id.* at Tr. 402:4-9.) LabCorp's witnesses were thereafter allowed to testify to about documents' existence. (*Id.* at Tr. 402:6-9.)

beneficiaries." 29 U.S.C. § 1104(a)(1). Further, ERISA also requires retirement plan fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B). The Supreme Court and the Fourth Circuit have directed the courts to rely on the common law of trusts to "determin[e] the contours of an ERISA fiduciary's duty." *Reetz*, 74 F.4th at 183 (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 528–29 (2015)) (internal quotation marks omitted). Under the common law of trusts, a prudent fiduciary owes "a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 183–184 (quoting *Tibble*, 575 U.S. at 529) (internal quotation marks omitted).

ERISA demands that the content of the duty of prudence is defined by "the circumstances then prevailing." *Id.* at 182 (quoting 29 U.S.C. § 1104(a)(1)(B) (internal quotation marks omitted)). The Supreme Court has declined to define the scope of the continuing duties of a prudent fiduciary to monitor investments but has recognized that ERISA fiduciaries maintain "a continuing duty of *some kind*." *Id.* at 184 (quoting *Tibble*, 575 U.S. at 530) (internal quotation marks omitted) (emphasis in original). The Fourth Circuit has interpreted this to mean that the duty of prudence analysis is "context-specific." *Id.* at 182 (citing *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014); *Tatum*, 761 F.3d at 360 (characterizing the ERISA duty of prudence analysis as a "totality-of-the-circumstances inquiry")).

The Fourth Circuit uses the term "procedural prudence" to refer to a fiduciary's investigation of ERISA plan investments and the associated costs of maintaining those

38

investments. *See, e.g., Tatum*, 761 F.3d at 357; *Stegemann v. Gannett Co., Inc.*, 970 F.3d 465, 479 (4th Cir. 2020). To evaluate procedural prudence, "a court must ask whether the fiduciary engaged in a reasoned decisionmaking process." *DiFelice*, 497 F.3d at 420; *see also Reetz*, 74 F.4th at 182 (citation omitted). Procedural prudence includes the duty to investigate, meaning a fiduciary should be "investigat[ing], research[ing], and review[ing] the options" for an ERISA plan's assets. *Reetz*, 74 F.4th at 182 (citing *Plasterers' Loc. Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 216 n.8 (4th Cir. 2011)). A fiduciary's procedural prudence may also include, "appointing an independent fiduciary, seeking outside legal and financial expertise, holding meetings to ensure fiduciary oversight of the investment decision, and continuing to monitor and receive regular updates on the investment's performance." *Tatum*, 761 F.3d at 358.

However, the duty of prudence is not "concerned with results." *Id.* at 381. Further, a prudent fiduciary does not need to be clairvoyant, nor must they be making the optimal investment decisions given the benefit of hindsight. *Id.* (citing *DiFelice*, 497 F.3d at 424). Instead, a prudent fiduciary "appropriately investigate[s] the merits of an investment decision prior to acting." *Id.* at 358. Indeed, the Fourth Circuit has held that "it is 'implausible as a general rule' that a 'fiduciary should have recognized from publicly available information alone'" whether an investment decision is reasonable in the absence of special circumstances. *Stegemann*, 970 F.3d at 483 (quoting *Dudenhoeffer*, 573 U.S. at 426).

To make a prima facie case for breach of fiduciary duty under ERISA it must be shown by a preponderance of the evidence: (1) that the defendant was a fiduciary of the ERISA plan; (2) that the defendant breached its fiduciary responsibilities under the plan; and (3) that the plan suffered a loss from the defendant's breach. *See Tatum*, 761 F.3d at 361; *see also Stegemann*,

970 F.3d at 473 (citations omitted). Drawing on the common law of trusts, the Fourth Circuit has held that the plaintiff must make this prima facie showing. *See* 29 U.S.C. §§ 1104(a)(1)(B), 1109(a); *Pepper*, 663 F.3d at 219–20; *accord Tatum*, 761 F.3d at 363.

If plaintiff makes this showing, the burden of proof is then placed on the fiduciary to prove that "its imprudent decision-making did not cause the [p]lan's loss." *Tatum*, 761 F.3d at 363. To meet this burden, defendant must prove that despite its imprudent decision-making process, its ultimate decision was objectively prudent. *Id.* "A decision is objectively prudent if a hypothetical prudent fiduciary would have made the same decision anyway." *Id.* (citing *Pepper*, 663 F.3d at 218) (internal citation marks omitted). Further, a "plan fiduciary carries its burden by demonstrating that it would have reached the same decision had it undertaken a proper investigation." *Id.* at 364. "Even if a trustee failed to conduct an investigation before making a decision and a loss occurred, the trustee is insulated from liability . . . if a hypothetical prudent fiduciary would have made the same decision anyway." *Id.* at 357 (quoting *Pepper*, 663 F.3d at 218).

2. <u>Allegation 1: LabCorp's Alleged Failure to Prudently Monitor the Plan's Recordkeeping Fees</u>

Plaintiffs contend that LabCorp breached its fiduciary duty of prudence by failing to monitor or control the compensation the Plan paid to Fidelity for recordkeeping services. Plaintiffs must first prove the prima face elements by a preponderance of the evidence. As stated above, the prima facie elements are: (1) that the defendant was a fiduciary of the ERISA plan; (2) that the defendant breached its fiduciary responsibilities under the plan; and (3) that the plan suffered a loss from the defendant's breach. *See Tatum*, 761 F.3d at 361. As Plaintiffs

40

have proved the first element —whether the LabCorp was a fiduciary of the Plan— the Court will now analyze whether Plaintiffs proved the remaining elements of their prima facie case.

          a.        Plaintiffs Failed to Prove LabCorp Breached its Fiduciary Responsibilities to Monitor Recordkeeping Fees

Fiduciaries breach their fiduciary duties when they fail to monitor and control recordkeeping fees incurred by the plan. *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (upholding district court's finding that the fiduciaries breached their duties by failing to diligently investigate Fidelity and monitor plan recordkeeping costs). "[T]he context of the duty of prudence turns on the circumstances . . . prevailing at the time the fiduciary acts, §1104(a)(1)(B), the appropriate inquiry will necessarily be context specific." *Dudenhoeffer*, 573 U.S. at 425 (internal quotation marks omitted).

The evidence presented at trial showed that in monitoring the Plan's recordkeeping, LabCorp retained Fidelity as a recordkeeper, employed CAPTRUST as an advisor, met regularly to discuss recordkeeping, and conducted benchmarking studies. Gissiner credibly testified that due to all of these factors, he found LabCorp's "process to monitor recordkeeping fees was reasonable and consistent with industry practice." (ECF No. 115 at Tr. 757:14-16 (Gissiner).) Specifically, he found it was industry practice to have a plan comprised of senior executives from diverse backgrounds, meet quarterly to monitor the plan, and to have fiduciary training occur quarterly at committee meetings in the form of reports on changes in the industry and investments. (*Id.* at Tr. 759:9-12, 761:9-12, 762:4-9 (Gissiner).) All things that LabCorp conducted in accordance with the Plan.

Plaintiffs' repeated refrain at trial was that the Plan remaining with the same recordkeeper throughout the class period, rather than changing recordkeepers, was problematic on its face. However, Gissiner testified that Fidelity was "the best provider in the industry" for recordkeeping services. (ECF No. 115 at Tr. 761:2-4 (Gissiner).) Without more, Plaintiffs' assertions that the Plan would have been more prudently managed if Fidelity were replaced are unavailing.

Further, Plaintiffs heavily contended throughout trial that LabCorp acted imprudently by failing to conduct an RFP during the class period. At trial Plaintiffs failed to present any evidence that industry standard requires that an RFP be conducted. Plaintiffs' expert Otto testified that RFPs are the "most effective way to understand what [recordkeeping] fees are." (ECF No. 113 at Tr. 194:20-22 (Otto).) However, he also testified that RFPs are "not a requirement." (*Id.* at Tr. 194:20 (Otto).)

Minnich contends that RFPs are "the only way to determine what the true value of services is relevant to the [] most reasonable fee." (ECF No. 114 at Tr. 356:23-25 (Minnich).) However, like Otto, Minnich also testified that RFPs are not the only way to determine recordkeeping fees. He states, "I've not stated, nor is it my testimony, that the only way to determine fees is an RFP." (ECF No. 114 at Tr. 356: 21-22 (Minnich).) While the court affords Otto and Minnich's testimonies little weight, even if it were to give it full credence, both experts fail to support Plaintiffs' contention that the failure to conduct an RFP led to excessive recordkeeping costs.

LabCorp's expert Gissiner credibly testified that the process LabCorp employed in monitoring recordkeeping was reasonable. Gissiner stated that RFPs are "appropriate for plan

sponsors that are experiencing servicing issues." (ECF No. 115 at Tr. 779:9-10 (Gissiner).)
He also testified that "there are other reasonable, appropriate methods to assess [fee]
reasonableness" other than an RFP. (*Id.* at Tr. 780:3-4 (Gissiner).) When addressing whether
RFPs are industry practice, Gissiner testified that "the notion that you have to conduct an
RFP to assess and determine whether fees are reasonable is . . . very much an outdated
viewpoint of the market." (*Id.* at Tr. 779:5-8 (Gissiner).)

To support his testimony that RFPs are not the only way to determine a reasonable
recordkeeping fee, Gissiner discusses a survey conducted by the Callan Institute in the years
2019, 2021, and 2022. The survey that shows that 9 out of 10 Plan sponsors use benchmarking
studies as part of their fee evaluation process. DX 21 at 30; (ECF No. 116 at Tr. 854:2-4
(Gissiner).) While only 9% to 15% of plans conducted RFPs. DX 21 at 30; (ECF No. 116 at
Tr. 854:16-18 (Gissiner).) Therefore, the Court finds Plaintiffs have failed to show that
LabCorp's lack of conducting an RFP constitutes a breach of fiduciary duty.

Plaintiffs also made contentions during trial that LabCorp delegated all its duty with
respect to recordkeeping to CAPTRUST. Plaintiffs repeatedly asked witnesses why the
Committee themselves did not reach out to Fidelity to negotiate a lower recordkeeping fee.
(*See e.g.*, ECF No. 115 at Tr. 821:11-15.) Gissiner testified that "it's certainly reasonable for
plans of [this] size and larger to use an investment advisor or a consulting firm to negotiate
fees with their recordkeeper." (*Id.* at Tr. 821:17-19 (Gissiner).) Though Plaintiffs repeatedly
contended that this was a mark of imprudence, they presented no evidence that it is common
practice for committee members themselves to directly negotiate with a recordkeeper.

Ultimately, LabCorp engaged in negotiations with Fidelity twice during the class period following the benchmarking studies. After the 2017 RFI, the committee decided that although the Plan's recordkeeping fee fell within the range of comparators, "it would not be unreasonable to go back to Fidelity and . . . try and negotiate something better." (ECF No. 114 at Tr. 449:18-20 (Pringle).) Those negotiations led to an overall decrease in the recordkeeping fee, from $33 to $32, Joint Ex. 2 at 1.[5]

Following the 2022 internal benchmarking study, the committee discussed the Plan's recordkeeping fee being within range of comparator plans, however it was on the higher end. The committee then directed CAPTRUST to negotiate which led to the fee decreasing from $32 to $29. JX 3 at 1. The evidence at trial shows that CAPTRUST conducted four studies during the six-year class period to assess the Plan's recordkeeping fees, and on two occasions the studies led to lower fees paid to Fidelity.

Lastly, in their Complaint, Plaintiffs allege that LabCorp paid an excessive amount to Fidelity in float compensation. However, during trial, Plaintiffs presented no evidence regarding the amount of float compensation paid to Fidelity. As Plaintiffs presented no evidence on the issue of Float, the allegation fails.

Therefore, the Court finds that Plaintiffs have failed to prove the second element of their prima facie case, that LabCorp breached its fiduciary duty of prudence. Nevertheless,

---

[5] While the 2015 Trust Agreement between LabCorp and Fidelity states the per participant fee as $30, JX 1 at 1, LabCorp calculates the recordkeeping fee as $33 to include indirect fees paid to Fidelity. Therefore, while the actual recordkeeping fee increased from $30 to $32 following negotiations, the elimination of participants paying indirect fees to Fidelity resulted in an overall decrease in recordkeeping fees paid by participants.

this Court will still analyze whether Plaintiffs have established the third element of their prima facie case, damages.

b.     Plaintiffs failed to prove that the Plan suffered loss

Even assuming arguendo that Plaintiffs established the second element of their prima facie case, Plaintiffs are unable to establish that the plan suffered a loss from LabCorp's alleged breach. Plaintiffs bear the burden of "prov[ing] the defendant-fiduciary's procedural imprudence and a prima facie loss." *Tatum*, 761 F.3d at 364.

Neither of Plaintiffs experts opined on the damages that the Plan suffered as a result of the purported excessive record keeping fees. This Court previously excluded Otto's opinion on reasonable recordkeeping fees prior to trial as his opinions were unreliable. (ECF No. 76 at 7 ("The Court finds[] that Otto's opinion related to what is a reasonable recordkeeping fee, is not supported by any scientific methodology, nor supported by appropriate validation, and therefore is not reliable.").) Any testimony Plaintiffs attempted to elicit from Otto during trial about his calculations on reasonable recordkeeping fees was inadmissible, and therefore not allowed.

Plaintiffs other expert Minnich, specifically testified that he did not conduct any opinion on damages. "I did not do any damages calculations. My task was to determine the reasonableness of the fees relative to the services, and I did that." (ECF No. 114 at Tr. 324:25-352:2 (Minnich).) Although Minnich did not conduct damages calculations, Plaintiffs during trial attempted to combine Minnich's calculation of a reasonable recordkeeping fee, with Otto's damage calculations that were inadmissible. When shown Otto's damage calculation Minnich testified that he had just seen the calculations for the first time during trial. (ECF

45

No. 114 at Tr. 323:18-21 (Minnich).)  Therefore, Plaintiffs were not able to lay a foundation

for the demonstrative containing damage calculations and it was not considered by this Court.

(*Id.* at Tr. 328:10–16.)

Accordingly, Plaintiffs failed to prove the second and third elements of their prima

facie case by a preponderance of the evidence and therefore are unable to establish their claim.

On the other hand, the Court concludes that LabCorp used a prudent process to monitor the

recordkeeping fees it paid to Fidelity.  Thus, the Court finds in favor of LabCorp on this claim.

3.    Allegation 3: LabCorp's alleged failure to prudently monitor the Plan's share classes

Plaintiffs also allege that LabCorp breached its fiduciary duty of prudence with respect

to the Plans investment options.  During trial Plaintiffs contend that LabCorp selected high-

cost share classes for the Plan's investment options when identical lower-cost share classes

were available.  Plaintiffs center this clam around three investments, the T. Rowe Price Target

Date Funds ("TDFs"), the Fidelity Contrafund Comingled Pool ("Contrafund"), and the

Fidelity Managed Income Portfolio ("MIP").  Like Plaintiffs recordkeeping claim, the Court

will first determine whether Plaintiffs have proven their prima facie case.

An ERISA fiduciary acts imprudently "by failing to properly monitor investments and

remove imprudent ones."  *Tibble*, 575 U.S. at 530.  "[P]lan fiduciaries are required to conduct

their own independent evaluation to determine which investments may be prudently included

in the plan's menu of options" and they must "remove . . . imprudent investment[s] from the

plan within a reasonable time."  *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022) (citing *id.* at 529–

30).  "A fiduciary may breach his duties to plan beneficiaries by failing to investigate and

evaluate the merits of his investment decisions." *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995) (citations omitted); accord *DiFelice*, 497 U.S. at 420 (citing *Kuper*, 66 F.3d at 1459).

Regarding each challenged investment option, Otto opined that the Plan was invested in higher cost share classes when lower costs were available. Otto testified that although a Plan may not meet the minimum asset requirement to enter a lower cost share class, LabCorp had the ability to negotiate, and they failed to do so. However, the basis for Otto's opinion is solely his "experience" that negotiations to lower share classes can be done. (ECF No. 113 at Tr. 151:2-18 (Otto).) As the Court previously stated, Otto's testimony has little credence. When asked if he was aware "of a single instance where LabCorp satisfied the asset threshold of the [TDF] and did not go into the [lower] share class?" Otto responded, "I believe the answer to that is correct." (ECF No. 113 at Tr. 163:20-23 (Otto).) Plaintiffs failed to present credible evidence that the Plan was invested in higher cost share classes when it was eligible for a lower cost share class.

Conversely, Gissner credibly testified that "the Committee engaged in a reasonable process to look at alternative share classes . . . there's clear documentation of the relevant period that the Committee did look at and did adopt lower-cost share classes." (ECF No. 115 at Tr. 800:10-14 (Gissiner).) Therefore, Plaintiffs failed to prove that LabCorp breached its fiduciary duty of prudence, the second element of the prima facie case.

Even assuming that Plaintiffs proved that LabCorp breached its duty of prudence, Plaintiffs failed to prove damages, the third element of the prima facie case. During trial Otto testified that the Plan suffered losses while it was in higher cost share classes. For example, Otto testified that the plan lost $3.7 million dollars from 2017 to 2022 in the Fidelity

47

Contrafund Commingled Pool investment, $6.4 million in the T. Rowe Price Target Date Funds, and $200,000 in the Fidelity Managed Income Portfolio. (ECF No. 113 at Tr. 131:22-25, 154:21, 140:2-3 (Otto).)

Again, Otto's testimony on these damage calculations is based purely in his "experience." "Although uncertainty as to the amount of damages will not preclude recovery, uncertainty as to the fact of damages may and in this case does because the only evidence supporting the existence of actual damages is overly speculative." *Dash v. Mayweather*, 731 F.3d 303, 325 (4th Cir. 2013) (internal quotation marks omitted) (citation omitted). The evidence presented by Plaintiffs'—that the Plan lost millions because of alleged imprudent investment decisions—was not credible, and Plaintiffs failed to prove that the damage calculations are anything more than pure speculation.

For these reasons, the Court concludes that LabCorp employed a prudent process to monitor the share classes of the investment options in the Plan. Thus, the Court finds in favor of LabCorp on this claim, and the evidence presented by Plaintiffs had no evidentiary value.

4.     Plaintiffs' allegations of LabCorp's wrongdoing that are new to trial cannot be made and will not be considered by the Court

Throughout the trial, Plaintiffs alleged that LabCorp also breached its fiduciary duty because the members of the LabCorp Plan Committee were poorly or inadequately trained or were otherwise unqualified to manage the Plan. For instance, in Plaintiffs' proposed findings of fact and conclusions of law, there is a three-page long section dedicated to discussing what evidence was presented at trial to show that the LabCorp Plan Committee "lacked the training, education, and understanding necessary to fulfill these responsibilities for a multi-billion-dollar

retirement plan." (ECF No. 118 ¶¶ 119–123.) Nowhere in Plaintiffs' complaints, motion briefing, or pretrial disclosures, are there allegation of this kind against LabCorp. This Court's review of the evidence leads it to conclude that Plaintiffs' allegations of LabCorp's inadequate selection and training of Plan Committee members was made for the first time at trial.

"A case may not proceed to trial on 'an [unpled] theory of recovery' without 'express or implied consent of the parties.'" *Papania v. United States*, 715 F. Supp. 3d 789, 802 (E.D. Va. 2024) (citing *Pinkley, Inc. v. City of Frederick, Md.*, 191 F.3d 394, 401 (4th Cir. 1999); *see* Fed. R. Civ. P. 15(b)(2)). "In other words, the plaintiff must either amend the complaint or the parties must 'constructively amend the complaint' by, for example, 'agreeing . . . to litigate fully an issue not raised in the original pleadings.'" *Id.* (citation omitted). Plaintiffs have not moved to amend the Complaint, and did not move to amend during trial, nor has LabCorp consented to Plaintiffs' presentation of this new theory of liability.[6] Fed. R. Civ. P. 15(b)(2). Further, Plaintiffs placing these new arguments in writing for the first time before the Court in their post-trial proposed findings of fact and conclusions of law certainly constitutes unfair surprise and prejudice to LabCorp, when Plaintiffs' pretrial orders and briefs do not reflect that they would be submitting such evidence. Fed. R. Civ. P. 26(a)(3), (e). For these reasons, this Court declines to consider these new arguments from Plaintiffs. Moreover, even if this Court were to consider the issue, the record demonstrates insufficient evidence to grant relief to Plaintiffs on their new and tardy theories of recovery.

---

[6] LabCorp attempted to respond to these new allegations by providing some evidence at trial to show that Committee members did receive training to assist them in their management of the Plan, and that the selection of the members were consistent with industry practice.

## IV. CONCLUSION

For the above reasons, the Court concludes that LabCorp used a prudent process to monitor the Plan's recordkeeping fees and share classes. Therefore, the Court rules against Plaintiffs and in favor of LabCorp on Plaintiffs' claim of breach of fiduciary duty of prudence by LabCorp.

### ORDER

**IT IS THEREFORE ORDERED**

This, the 12th day of August 2025.

/s/ Loretta C. Biggs
Senior United States District Judge

Case 1:22-cv-00680-LCB-JLW    Document 119    Filed 08/12/25    Page 50 of 50